[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13962

_____

D.C. Docket No. 0:13-cr-60024-WPD-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NAEL SAMMOUR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 16, 2016)

Before WILLIAM PRYOR and DUBINA, Circuit Judges, and ROBRENO,[*]
District Judge.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

This appeal requires us to review the convictions and sentence of Nael Sammour, who participated in a scheme to file fraudulent income tax returns with stolen identities. Sammour, an Arab Muslim, argues that he was denied a fair trial after a juror, at the start of deliberations, slipped a note to the clerk stating that she feared for her safety because "this reeks of al Qaeda." The juror expressed this fear even though Sammour was charged with *identity theft*; the case had nothing to do with terrorism or al Qaeda. Exercising its "broad discretion" in dealing with potential juror bias, *United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir. 1978), the district court questioned the juror outside the presence of the other jurors, dispelled her fears, and found that she could be fair and impartial before returning her to the jury room. Sammour quibbles with the questions the district court asked and the credibility determination it made, but the district court is expert in these matters. *See Patton v. Yount*, 467 U.S. 1025, 1038–39 (1984). It interacts with jurors every day (we never do), and it was present when the juror answered its questions (we were not). The district court did not abuse its discretion. And Sammour's challenges to the sufficiency of the evidence, the jury instructions, and the reasonableness of his sentence are meritless. We affirm.

2

## I. BACKGROUND

Nael Sammour is a 55-year-old man who owned a wholesale grocery store in Broward County, Florida. He is an Arab Muslim who immigrated to the United States in 1980. And soon after, he started a life of crime in this country.

In 2012, Sammour became involved in a scheme to file fraudulent income tax returns. Sammour's cohorts stole the names and social security numbers of other persons and filed federal tax returns on their behalf. When the Treasury Department issued refund checks based on the fraudulent returns, the fraudsters had the checks mailed to themselves.

Sammour's job was to cash the checks. He enlisted someone to create fake driver's licenses and social security cards for the names on the checks. But because cashing fraudulent checks is difficult, Sammour needed someone with connections to check-cashing stores willing to look the other way.

The Internal Revenue Service detected this scheme and sent Agent Amjad Qaqish undercover to pose as an interested check-casher. Agent Qaqish met with Sammour seven times. Their meetings were conducted in Arabic, and Agent Qaqish surreptitiously recorded the meetings with a camera and microphone. All told, Sammour gave Agent Qaqish 70 Treasury checks totaling more than $700,000. Agent Qaqish never actually cashed the checks, but he made small payments to Sammour to maintain their relationship.

Two meetings between Sammour and Agent Qaqish are particularly important. On November 17, 2012, Agent Qaqish met Sammour at a Starbucks coffee shop. Sammour gave him a Treasury check for $377,049 made payable to "Alex Giorland" for Agent Qaqish to cash in exchange for a 25 percent commission. Sammour also gave him a fake driver's license for "Alex Giorland" and an envelope with a social security number and date of birth on it. On December 6, 2012, Agent Qaqish met Sammour at a Popeye's restaurant. Sammour gave Agent Qaqish a Treasury check for $5,318.25 made payable to "Angie H. Gonzales," as well as a fake driver's license and social security card.

In the course of these meetings, Sammour revealed that he had a sophisticated understanding of the tax-fraud scheme. He told Agent Qaqish that he was "a hundred percent sure" that the checks were "good." "[T]he way this is done," Sammour explained, "is we set it up so where we pick one individual, give him three dependents, put down that he doesn't make too much money, and then we're able to maximize the amount of the refund that he gets." "[T]hey make sure their calculations are exactly accurate so they can maximize the refunds." When Agent Qaqish expressed concern that the victims might report the checks as stolen, Sammour told him not to worry. His cohorts select their victims "carefully" by "trying to find people that wouldn't have filed tax returns." "[W]e wait to make sure that whoever is gonna file has filed, and then we do this."

4

Sammour was arrested in January 2013. Agents found two Treasury checks in his pockets worth $11,794.99 and three Treasury checks in his car worth $22,879.97. Those checks brought the total number of checks that Sammour had transferred or possessed to 75.

A grand jury indicted Sammour on two counts of aggravated identity theft, 18 U.S.C. § 1028A, and eight counts of theft of public money, *id.* § 641. Sammour pleaded guilty to the eight counts of theft of public money without the benefit of a plea agreement. But he went to trial on the two counts of aggravated identity theft.

At trial, the government called four witnesses: Agent Qaqish, Agent Bradley Cohen, Alex Giorlando, and Angie Huerta Gonzalez. Agent Qaqish testified about the undercover sting and his meetings with Sammour. The jury watched the videotapes of the meetings at Popeye's and Starbucks while Agent Qaqish narrated what was happening. Because Sammour and Agent Qaqish were speaking Arabic on the videotapes, the jury followed the conversations by reading transcripts that were translated into English.

Agent Cohen, a special agent in the Service's Criminal Investigation Division, explained to the jury how tax fraud works. When the Service receives a tax return, it verifies the filer's identity by checking his social security number and the first four letters of his last name. If this information matches the information in the Service's database, then the Service will issue a Treasury check to the address

5

listed on the return. The Service does not verify whether the filer lives at that address. A fraudster who has someone's name and social security number can file a return on that person's behalf and change the address so that the check comes to him instead. But this scheme does not work unless the fraudster files the fraudulent return before the victim files her legitimate return, as the Service will issue only one check per person.

The government called Alex Giorlando and Angie Huerta Gonzalez to prove that they were the same "Alex Giorland" and "Angie H. Gonzales" whose identifications Sammour had given to Agent Qaqish. Agent Cohen found these individuals after the Service recovered their checks. Both witnesses testified that they spell their names slightly differently than Sammour's documents spelled them: Alex Giorlando has an "o" on the end of his last name, and Angie Huerta Gonzalez has a "z" instead of an "s" on the end of her last name. But Alex Giorlando testified that the date of birth and social security number for "Alex Giorland" are his actual date of birth and social security number. And Angie Huerta Gonzalez testified that the social security number for "Angie H. Gonzales" is her actual social security number. The witnesses also testified that they had tried to file tax returns but were unsuccessful because someone had already filed returns in their names.

6

After the close of all evidence, Sammour filed a motion for a judgment of acquittal. He argued that the government failed to present sufficient evidence that "Alex Giorland" and "Angie H. Gonzales" were actual persons or that Sammour knew they were actual persons. The district court denied his motion.

The district court then instructed the jury. Although the indictment charged Sammour with possessing and transferring "a means of identification of another person, that is, [a] name and Social Security number," the jury instructions identified the relevant "means of identification" as "any name, social security number, *or date of birth*." (Emphasis added.) Despite this additional wording, Sammour did not object to the jury instructions.

While the jury deliberated, the district court received a note from the clerk. The note came from Juror 9, who silently slipped it to the clerk while the clerk was passing out lunch menus. We reproduce the note below with the juror's signature redacted.



7

The district court informed the parties about the note. Sammour asked for a mistrial, but the district court declined. It instead decided to question Juror 9 outside the presence of the other jurors.

The district court called Juror 9 back into the courtroom. It first asked her whether she had communicated her fears to any other juror. Juror 9 answered, "I have not." The district court asked, "So, this is just your own personal concern?" Juror 9 responded, "I'm just paranoid." The district court again asked her whether she had kept these concerns to herself. Juror 9 responded, "Oh, absolutely. Because I didn't want to sway the rest of the jury." The district court then sought to allay her concerns. It explained that "there's no connection to terrorism in this case. There's no evidence of it. There's no indication of Al-Qaeda or terrorism." "Even if there were a jury protection program," the district court explained, "this case wouldn't qualify for it." The district court asked Juror 9 whether she could "put aside this concern and be fair." She answered, "I'll do what's fair." The district court again asked her whether she could put aside her fears "and be a fair juror for both the defendant, the government, just follow the law, and base your verdict on the facts." Juror 9 answered, "Yes." The district court instructed her to return to the jury room. Sammour complained that Juror 9 looked like she was about to cry, but the district court disagreed. It "didn't see anything about her looking like she was gonna cry" and it "believe[d] her when she said that she would be fair." It

8

concluded that it had sufficiently "quelled" her fears, which she admitted were a product of her own idiosyncratic paranoia.

Shortly afterwards, the jury returned its verdict. It convicted Sammour of both counts of aggravated identity theft. Sammour renewed his motion for a judgment of acquittal, but the district court again denied it.

After the trial, the district court sentenced Sammour for the two counts of aggravated identity theft and the eight counts of theft of public money. The sentence for aggravated identity theft was straightforward. The statute required a sentence of 24 months per count, although sentences for multiple counts could run concurrently. 18 U.S.C. § 1028A. This statutory sentence could not be increased or decreased under the guidelines. *See* United States Sentencing Guidelines Manual § 2B1.6 (Nov. 2012). Accordingly, the district court imposed concurrent sentences of 24 months.

The sentence for theft of public money, by contrast, required more detailed calculations. The presentence investigation report recommended a guideline range of 70–87 months. It calculated an offense level of 26: the base offense level for theft of public money was 6, *id.* § 2B1.1(a)(2), and the report recommended an increase of 14 levels because the loss to the government was greater than $400,000, *id.* § 2B1.1(b)(1)(H), an increase of 4 levels because the crime involved more than 50 victims, *id.* § 2B1.1(b)(2)(B), and an increase of 2 levels because the

9

crime involved the trafficking of an access device, *id.* § 2B1.1(b)(11)(B). The report calculated a criminal history category of II. Sammour received 3 criminal history points for a 1995 conviction of federal bank fraud, for which he spent 27 months in prison and five years on supervised release.

Sammour has more than a dozen other convictions that were unscorable either because they were too old or because the sentences were too short. Those convictions include a 1982 conviction for possession of an unregistered handgun; a 1985 conviction for resisting an officer without violence; 1985 convictions for receiving stolen property and possession of criminal tools; 1987 convictions for driving with a suspended license and without a tag; 1988 convictions for aggravated assault, battery, aggravated battery, resisting an officer without violence, and corruption by threat against a public servant; a 1988 conviction for driving with a suspended license; 1991 convictions for forgery, uttering a forged instrument, and receiving stolen property; a 1991 conviction for federal bank fraud; and 2009 convictions for reckless driving and improperly passing a vehicle.

Both parties requested modifications to the presentence investigation report. The government asked for an upward departure to a higher criminal history category, *id.* § 4A1.3(a)(1), which the district court granted. Based on Sammour's numerous unscored convictions, the district court concluded that category II did not sufficiently represent his criminal history. It treated the unscored convictions as

10

if they were scorable, which yielded a total of 11 criminal history points and a criminal history category of V. Accordingly, the district court departed upward from criminal history category II to V. Sammour objected to the 2-level increase for trafficking an access device, and the district court sustained his objection.

Sammour also objected to the 4-level increase based on the number of victims, but the district court rejected his arguments. Sammour argued that he never "used" anyone's identification, *id.* § 2B1.1 cmt. n.4(E), because he "mere[ly] transfer[red]" the identifications to Agent Qaqish, *United States v. Hall*, 704 F.3d 1317, 1323 (11th Cir. 2013). The district court disagreed because Sammour's case involved "much more" than the transfer of identifications. Indeed, the presentence investigation report explained that "[t]he scheme involved the use of stolen identities, specifically names, social security numbers and dates of birth that are being *used* to file false income tax returns." (Emphasis added.) And Sammour never objected to that fact.

Sammour also objected to the 4-level increase for 50+ victims on the ground that the government had failed to prove the identifications belonged to 50 real individuals, but the district court overruled this objection too. The entire point of the tax-fraud scheme was to target real individuals, the district court explained. Sammour had 75 unique Treasury checks in his possession, and Agent Cohen testified that the Service does not issue Treasury checks to "false, made-up" social

11

security numbers. Agent Cohen also testified that he spoke to 26 of Sammour's victims on the phone, another 21 had mailed in affidavits, and the remaining 28 were listed in the Service's database. Based on this information, the district court concluded that Sammour's crimes affected at least 50 real victims.

Finally, the district court rejected Sammour's request for a 2-level decrease based on acceptance of responsibility, U.S.S.G. § 3E1.1(a). Sammour argued that he had accepted responsibility by pleading guilty to theft of public money and by apologizing for his actions during the sentencing proceedings. But the district court disagreed. Sammour forced the government to trial on the two counts of aggravated identity theft. And he downplayed his culpability during the sentencing proceedings by stating that "somebody just talked me into it." That statement, the district court found, "really doesn't sound like someone who's completely accepted responsibility."

With an offense level of 24 and a criminal history category of V, the final guideline range for the counts of theft of public money was 92–115 months. Although Sammour's brother testified at the sentencing hearing that Sammour is a good person who had performed charitable works in Haiti, the district court sentenced him to 115 months of imprisonment, the top of the guideline range. Applying the statutory sentencing factors, 18 U.S.C. § 3553(a), the district court stressed Sammour's extensive criminal history, which involved several violent

12

crimes as well as property crimes that resembled his current offenses. The district court concluded that a sentence of 115 months was needed to "promote[] respect for the law" and to provide "an adequate deterrent." It stated that it would have imposed this sentence "irrespective of how the guidelines were scored."

## II. STANDARDS OF REVIEW

Several standards of review govern the issues on appeal. We review the sufficiency of the evidence *de novo*. *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005). We also review *de novo* whether the jury instructions constructively amended the indictment, *United States v. Gutierrez*, 745 F.3d 463, 473 (11th Cir. 2014), but when a defendant raises this argument for the first time on appeal, we review it for plain error, *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013). We review the procedures used to address juror misconduct for abuse of discretion, and we review a finding that a juror was not biased for clear error. *See United States v. Dominguez*, 226 F.3d 1235, 1247 (11th Cir. 2000). Finally, we review sentences for abuse of discretion, *see United States v. Wetherald*, 636 F.3d 1315, 1320 (11th Cir. 2011), although we review the application of the guidelines *de novo* and findings of fact for clear error, *United States v. Barrington*, 648 F.3d 1178, 1194–95 (11th Cir. 2011).

13

## III. DISCUSSION

Sammour raises seven issues on appeal. Three pertain to his trial, and four to his sentence. We address the trial issues first and the sentencing issues second.

### *A. Trial Issues*

Sammour argues that we should vacate his convictions of aggravated identity theft because the district court made three errors at trial. First, he contends that the district court wrongly denied his motion for a judgment of acquittal based on the insufficiency of the evidence. Second, he argues that the district court issued a jury instruction that constructively amended the indictment. Third, he contends that the district court abused its discretion in dealing with Juror 9. We discuss, and reject, these arguments in turn.

### 1.  Sufficient Evidence Supports the Convictions of Aggravated Identity Theft.

Sammour argues that he cannot be convicted of aggravated identity theft because the government failed to prove that the identifications belonged to real persons or that Sammour knew they belonged to real persons. The government must prove both elements beyond a reasonable doubt. *See Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009). But we must affirm the jury's verdict if "*any* rational trier of fact could have found the[se] essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[W]e view the

14

evidence in the light most favorable to the prosecution and draw all reasonable inferences and credibility choices in favor of the jury verdict." *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013). Sammour cannot clear this high hurdle.

A rational jury could have found, beyond a reasonable doubt, that the identifications belonged to real persons. Agent Cohen testified that the Service does not issue a Treasury check for a tax return without a valid social security number. And he determined that the social security numbers Sammour transferred to Agent Qaqish belonged, in fact, to Alex Giorlando and Angie Huerta Gonzalez. Alex Giorlando testified that the date of birth and social security number for "Alex Giorland" were his date of birth and social security number, and Angie Gonzalez testified that the social security number for "Angie H. Gonzales" was her social security number. The probability that someone made up the names "Alex Giorland" and "Angie H. Gonzales" and randomly assigned them the actual social security numbers of Alex Giorlando and Angie Huerta Gonzalez is zero. Sammour argues that the names on the identifications are misspelled, but the misspellings are suspicious too. Agent Cohen testified that the Service verifies only the first four letters of a filer's last name. Someone who understood this process could slightly misspell the filer's name—here, only the last letters of "Giorlando" and "Gonzalez" are misspelled—and avoid detection by the Service while maintaining

15

plausible deniability. Unfortunately for Sammour, his deniability is not plausible. A rational jury easily could have found that the stolen identifications for "Alex Giorland" and "Angie H. Gonzales" belonged to real persons.

A rational jury also could have found, beyond a reasonable doubt, that Sammour knew the stolen identifications belonged to real persons. The videotaped meetings with Agent Qaqish revealed that Sammour had a sophisticated understanding of the tax-fraud scheme. He explained that his cohorts "pick" their victims "carefully" and target people who "wouldn't have filed tax returns." He also explained that "we wait to make sure that whoever is gonna file has filed" before attempting to file a fraudulent return. Sammour understood the scheme well enough to boast to Agent Qaqish that he was "a hundred percent sure" the Treasury checks were valid. Viewing this evidence in the light most favorable to the government, a rational jury could have found that Sammour knew the identifications he gave to Agent Qaqish belonged to real persons. Using stolen identities was the central feature of the scheme.

2.  The Jury Instructions Did Not Plainly Amend the Indictment.

Sammour contends that the jury instructions constructively amended the indictment in violation of the Fifth Amendment. "A constructive amendment 'occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in

16

the indictment.'" *Madden*, 733 F.3d at 1318 (quoting *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990)). Sammour argues that the jury instructions constructively amended the indictment by adding an additional means of identification ("date of birth") to the means listed in the indictment ("name and social security number"). Sammour concedes that he did not raise this argument in the district court and that we review it for plain error.

Sammour's concession that he has raised this issue for the first time on appeal is wise, but fatal. "[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving [an issue]." *United States v. Cavallo*, 790 F.3d 1202, 1234 (11th Cir. 2015) (second alteration in original) (quoting *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003)). Sammour cannot identify any precedent establishing that a constructive amendment occurs in this circumstance.

Neither this Court nor the Supreme Court has ever held that a jury instruction for aggravated identity theft constructively amends the indictment when it lists an additional means of identification. Sammour cites no such decision, and we cannot find one. In *United States v. Narog*, we held that a jury instruction for possession of a controlled substance constructively amended the indictment when it changed "methamphetamine" to "some controlled substance." 372 F.3d 1243, 1247–49 (11th Cir. 2004) (citing *United States v. Weissman*, 899 F.2d 1111 (11th

17

Cir. 1990)). But *Narog* does not plainly extend to other crimes or circumstances. *See United States v. Dortch*, 696 F.3d 1104, 1112–14 (11th Cir. 2012) (concluding that a jury instruction for felon in possession of a firearm did not plainly amend the indictment when it changed "a Taurus . . . pistol and an Arminius revolver" to "a firearm"). In *United States v. Baldwin*, we suggested that, under *Narog*, a constructive amendment would "potentially" occur if a jury instruction for aggravated identity theft "allow[ed] a conviction based on the use of a different means of identification" from the one listed in the indictment. 774 F.3d 711, 725 (11th Cir. 2014). But that equivocal dictum cannot establish "plain" error. *United States v. Lett*, 483 F.3d 782, 790 (11th Cir. 2007); *accord United States v. Whren*, 111 F.3d 956, 960–61 (D.C. Cir. 1997) ("[I]t is not a plain error for a trial court not to follow a mere dictum of the court of appeals."). Some of our sister circuits draw a distinction between a jury instruction that changes an *element* of the crime and a jury instruction that merely changes a *means* of satisfying an element of the crime. *See, e.g.*, *United States v. D'Amelio*, 683 F.3d 412, 422 (2d Cir. 2012). "Date of birth" is not an element of aggravated identity theft; it is a means of satisfying the "means of identification" element. Altering a means does not constructively amend the indictment, according to our sister circuits, because it does not alter an "essential element" of the crime such that "the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Robison*,

18

904 F.2d 365, 369 (6th Cir. 1990) (quoting *United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989)); *accord United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992). Because the law in this Circuit is unsettled and other courts have rejected Sammour's argument, we cannot say that the district court plainly erred. *See Dortch*, 696 F.3d at 1112.

### 3. The District Court Did Not Abuse Its Discretion in Responding to the Note from Juror 9.

Sammour argues that the district court abused its discretion by allowing Juror 9 to remain on the jury even after her note expressed concerns that Sammour was affiliated with al Qaeda. The district court allowed Juror 9 to remain on the jury after questioning her outside the presence of the other jurors and finding that she would be fair and impartial. Sammour contends that Juror 9 could not be impartial and that the district court should have either dismissed her, declared a mistrial, or warned her not to share her fears with the other jurors.

To prevail, Sammour must establish, based on a cold record, that the district court abused its broad discretion despite its superior vantage point:

> The most salient aspect of the law in this area is the breadth of discretion given to judges who are called upon to deal with the possibility of juror misconduct. District court judges deal with jurors on a regular basis, and those judges are in the trenches when problems arise. The problems that present themselves are seldom clearly defined and a number of variables have to be considered. There are often no obviously right or wrong answers to the questions that arise. . . . . [T]he district court is in a better position to evaluate credibility, as well as "the mood at trial and the predilections of the jury."

19

*Dominguez*, 226 F.3d at 1246–47 (citation omitted) (quoting *United States v.*

*Harris*, 908 F.2d 728, 734 (11th Cir. 1990)). When a district court finds that a juror

is not biased, our "deference . . . is at its pinnacle." *Skilling v. United States*, 561

U.S. 358, 396 (2010). "[T]he determination is essentially one of credibility, and

therefore largely one of demeanor," *Yount*, 467 U.S. at 1038, and "[i]t is here that

the [reviewing] court's deference must operate," *id.* at 1040. *Accord Chiantese*,

582 F.2d at 980. Sammour comes nowhere near satisfying this standard.

The district court did not clearly err in finding that Juror 9 could be fair and

impartial. After hearing her answers to its questions, the district court "believe[d]

her when she said that she would be fair." Sammour argues that Juror 9 was

hesitant and looked like she might cry, but the district court disagreed. We have no

basis to overturn its finding: the "cold record" does not reveal the inflections in

Juror 9's voice or her demeanor as she answered the questions. *Yount*, 467 U.S. at

1040. Furthermore, the district court took measures to allay Juror 9's fears by

explaining that the case had nothing to do with terrorism and that her life was not

in any danger. It reasonably found that this discussion "quelled" her concerns,

especially because her concerns did not appear to be that serious to begin with. As

soon as the district court started questioning her, Juror 9 confessed that she is "just

paranoid." And Juror 9 proved she was sensitive to the need to remain fair and

impartial. She silently slipped her note to the clerk so that the other jurors would

20

not notice, and she did not share her fears with the other jurors because she "didn't want to sway [them]." When questioned, she confirmed that she would "do what's fair" in Sammour's case. The district court found her credible, and nothing in the record suggests that its finding was clearly erroneous.

Because the district court did not clearly err in finding that Juror 9 was unbiased, it did not abuse its discretion by refusing to declare a mistrial or dismiss her from the jury. Nor did it need to remind Juror 9 not to share her fears with the other jurors. The whole tenor of its questioning informed Juror 9 that she should keep her concerns to herself, and Juror 9 acknowledged that she understood why when she said she "didn't want to sway the rest of the jury." The district court did not abuse its discretion by failing to remind Juror 9 of something she already knew.

Sammour speculates that the other jurors may have harbored fears similar to those of Juror 9, but a defendant alleging juror bias "must do more than speculate." *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990). Sammour never challenged any other juror in the district court, which is "strong evidence that he was convinced [they] were not biased." *Skilling*, 561 U.S. at 396 (quoting *Beck v. Washington*, 369 U.S. 541, 558 (1962)). He argues that the district court should have questioned the other jurors individually to make sure they did not have fears about al Qaeda. But such an approach could have backfired by raising concerns in the minds of the jurors that were not there before. *See United States v. Register*,

21

182 F.3d 820, 841 (11th Cir. 1999). In sum, we cannot say that the district court abused its considerable discretion in responding to the note from Juror 9.

### B.  Sentencing Issues

Although Sammour raises arguments about his sentence of 24 months for aggravated identity theft, those arguments are frivolous. The district court imposed the statutory sentence for those counts, as it was required to do. *See* 18 U.S.C. § 1028A; U.S.S.G. § 2B1.6. No error occurred.

As for theft of public money, Sammour challenges his sentence of 115 months on four grounds. First, he argues that the district court should not have applied the 4-level enhancement for 50+ victims. Second, he contends that the district court should have applied the 2-level adjustment for acceptance of responsibility. Third, Sammour contends that the district court should not have departed upward from criminal history category II to V. Fourth, he argues that a sentence of 115 months is substantively unreasonable. We address these arguments in order. None is meritorious.

1.  The District Court Did Not Abuse Its Discretion When It Applied the Enhancement for 50+ Victims.

Sammour argues that the district court should not have increased his offense level based on the number of victims. The 2012 guidelines instruct district courts to increase the offense level for theft of public money by 4 if the offense "involved 50 or more victims." U.S.S.G. § 2B1.1(b)(2)(B). A "victim" of theft of public

22

money includes "any individual whose means of identification was used unlawfully or without authority." *Id.* § 2B1.1 cmt. n.4(E). The word "used" means the "employment of something . . . for the purpose for which it is adapted," *Hall*, 704 F.3d at 1322 (alteration in original) (quoting *Black's Law Dictionary* 1681 (9th ed. 2009)); it does not include the "mere transfer . . . without more," *id.* Moreover, the identifications must belong to "actual (*i.e.*, not fictitious)" individuals. U.S.S.G. § 2B1.1 cmt. n.1. Sammour argues that his victims are not "victims" under the guidelines because he merely transferred their identifications to Agent Qaqish. He also argues that the government failed to prove that the identifications belonged to 50 real individuals. We reject both arguments.

Sammour's victims qualify as "victims" under the guidelines because, although Agent Qaqish never "used" their identifications to cash the Treasury checks, Sammour's cohorts "used" their identifications to obtain the Treasury checks in the first place. *Cf. Hall*, 704 F.3d at 1322 (explaining that a defendant "used" identifications when her conspirators applied for and obtained credit cards with the identifying information). Under the guidelines, Sammour is responsible for all "relevant conduct," including the "reasonably foreseeable acts" of his cohorts that occurred "in furtherance of" the tax-fraud scheme and "in preparation for" his crimes. U.S.S.G. § 1B1.3. He is responsible for that conduct even though he was never charged with a conspiracy, *id.*, so long as the government can prove

23

it by a preponderance of the evidence, *see United States v. Faust*, 456 F.3d 1342, 1347 (11th Cir. 2006). And it did so here. Sammour explained the entire scheme to Agent Qaqish on the videotapes. Moreover, the presentence investigation report stated that "[t]he scheme involved the use of stolen identities, specifically names, social security numbers and dates of birth that are being *used* to file false income tax returns," (emphasis added), and Sammour admitted this fact by never objecting to it, *see United States v. Beckles*, 565 F.3d 832, 844 (11th Cir. 2009). Because Sammour's cohorts indisputably used the identifications to procure the Treasury checks, Sammour's victims count as "victims" under the guidelines.

The government also proved, by a preponderance of the evidence, that the identifications belonged to 50 real individuals. For starters, the Internal Revenue Service issued 75 Treasury checks, and Agent Cohen testified that the Service does not issue a tax refund without a valid social security number. This fact alone proves that Sammour's victims were real individuals. *See United States v. Philidor*, 717 F.3d 883, 886 (11th Cir. 2013). Moreover, Agent Cohen heard from 47 of the victims. The district court reasonably extrapolated that at least three of the remaining victims, all of whom appeared in the Service's database, would have been verified too if they had current phone numbers. Indeed, targeting real victims was the entire point of the scheme. The district court did not clearly err in finding that Sammour had at least 50 victims.

24

### 2. The District Court Did Not Abuse Its Discretion When It Denied an Adjustment for Acceptance of Responsibility.

According to Sammour, the district court should have granted an adjustment for acceptance of responsibility. Under the guidelines, a district court should decrease the offense level by 2 if the defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Sammour contends that he accepted responsibility by pleading guilty to the counts of theft of public money and by apologizing for his actions during the sentencing proceedings. But his arguments do not overcome the "great deference" we owe the district court due to its "unique position to evaluate a defendant's acceptance of responsibility." *United States v. Chukwura*, 5 F.3d 1420, 1424 (11th Cir. 1993) (citing U.S.S.G. § 3E1.1 cmt. n.5).

The district court did not clearly err when it found that Sammour had not accepted responsibility. Sammour apologized for his actions during the sentencing proceedings, but his belated apology was entitled to little weight. *See* U.S.S.G. § 3E1.1 cmt. n.1(H); *United States v. Jones*, 899 F.2d 1097, 1101 (11th Cir. 1990), *overruled in part on other grounds by United States v. Morrill*, 984 F.2d 1136 (11th Cir. 1993) (en banc). And even though Sammour pleaded guilty to the counts of theft of public money, a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.3. For example, Sammour continued to downplay his culpability at

25

the sentencing proceedings by stating that someone had "talked me into it." Such statements are inconsistent with accepting responsibility. *See United States v. Caraballo*, 595 F.3d 1214, 1233 (11th Cir. 2010). Sammour also "frivolously contest[ed] relevant conduct" by forcing the government to go to trial on the two counts of aggravated identity theft. U.S.S.G. § 3E1.1 cmt. n.1(A). Throughout this litigation, Sammour has denied that his victims are real persons and that he knew they were real persons—despite being caught on camera stating precisely the opposite. His denials are "inconsistent with acceptance of responsibility," *id.*, and outweigh his guilty plea to the counts of theft of public money, *id.* § 3E1.1 cmt. n.3. *See United States v. Williams*, 408 F.3d 745, 756–57 (11th Cir. 2005); *United States v. Lewis*, 115 F.3d 1531, 1537 (11th Cir. 1997). Because Sammour has not clearly accepted responsibility, the district court did not abuse its discretion by denying the 2-level adjustment.

### 3. The District Court Did Not Abuse Its Discretion When It Departed Upward to a Higher Criminal History Category.

Sammour contends that the district court abused its discretion when it increased his criminal history category from II to V. A district court can depart upward to a higher criminal history category if the lower category "substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). In making this determination, the district court can rely on "[p]rior sentence(s) not

26

used in computing the criminal history category." *Id.* § 4A1.3(a)(2)(A). Sammour

argues that the district court used the wrong methodology when it departed upward

to category V. He also contends that category V is too high because his past crimes

are low-level and old. Both arguments fail.

The district court used a valid method when it departed upward. A district

court may apply an upward departure using the following "step-by-step

procedure":

> [T]he court must look first to the next criminal history category. If
> that category adequately reflects the defendant's past conduct, then
> the court must state its findings and sentence the defendant within the
> range for the new category. "If, on the other hand, the court decides
> that this new category is still inadequate to reflect the defendant's
> criminal history, the court must look to the next highest category and
> repeat its inquiry."

*United States v. Williams*, 989 F.2d 1137, 1142 (11th Cir. 1993) (citations omitted)

(quoting *United States v. Johnson*, 934 F.2d 1237, 1239–40 (11th Cir. 1991)). But

a district court may also, alternatively, assign criminal history points to the

unscored convictions and extrapolate the criminal history category that would have

applied. *See United States v. Maurice*, 69 F.3d 1553, 1559 (11th Cir. 1995). The

district court followed this alternative—and equally valid—approach and

explained its calculations. Sammour does not argue that any of its calculations

were erroneous.

27

The nature of Sammour's criminal history warranted an upward departure to category V. Sammour argues that many of his past crimes are low-level and old, but the record proves otherwise. Sammour's history reflects a life of crime consisting of numerous convictions for various offenses over the course of four decades. Several of those convictions were for violent crimes. And several more involved fraud-based crimes similar to the ones Sammour committed here. We have affirmed large upward departures in similar circumstances. *See, e.g.*, *United States v. McKinley*, 732 F.3d 1291, 1298 (11th Cir. 2013); *United States v. Jones*, 289 F.3d 1260, 1267 (11th Cir. 2002). The district court did not abuse its discretion in doing so here.

### 4. The Sentence Is Substantively Reasonable.

Sammour's last argument is that his sentence is substantively unreasonable. The district court concluded that 115 months of imprisonment was an appropriate sentence for the eight counts of theft of public money due to Sammour's extensive criminal history. Sammour contends that the district court did not sufficiently account for other factors like his charitable works. But "[t]he weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court," *United States v. Johnson*, 803 F.3d 610, 618 (11th Cir. 2015), and Sammour cannot prove an abuse of discretion.

28

Sammour's sentence of 115 months is substantively reasonable. It is within the guideline range, and we ordinarily expect such sentences to be reasonable. *See United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008). When "*both* the sentencing judge and the Sentencing Commission . . . reached the *same* conclusion as to the proper sentence in the particular case," it "significantly increases the likelihood that the sentence is a reasonable one." *Rita v. United States*, 551 U.S. 338, 347 (2007). And a sentence of 115 months is far lower than the statutory maximum sentence of 80 years, *see* 18 U.S.C. § 641, which further supports its reasonableness, *see McKinley*, 732 F.3d at 1299. Moreover, the district court did not abuse its discretion in weighing Sammour's extensive criminal history more heavily than the other factors. *See United States v. Osorio-Moreno*, No. 14-14447, slip op. 1, 10–12 (11th Cir. Mar. 1, 2016); *United States v. Rosales-Bruno*, 789 F.3d 1249, 1263 (11th Cir. 2015). Despite Sammour's charitable works, the district court reasonably concluded that he needed a sentence at the top of the guideline range to "promote respect for the law" and "afford adequate deterrence," 18 U.S.C. § 3553(a)(2)(A)–(B). *See United States v. Snipes*, 611 F.3d 855, 872–73 (11th Cir. 2010). This Court "will not reweigh the factors." *Johnson*, 803 F.3d at 620.

## IV. CONCLUSION

We **AFFIRM** Sammour's convictions and sentence.

29