[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10510
_____

D.C. Docket No. 2:15-cr-00101-SPC-CM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DIOSME FERNANDEZ HANO,

REINALDO ARRASTIA-CARDOSO,
a.k.a. Reinaldo Arrastia,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(April 30, 2019)

Before WILLIAM PRYOR and NEWSOM, Circuit Judges, and ROSENTHAL,[*]
District Judge.

_____

[*] The Honorable Lee H. Rosenthal, Chief United States District Judge for the Southern District
of Texas, sitting by designation.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide two questions of first impression for our Circuit: (1) whether a five-year statute of limitations for a defendant implicated by DNA testing, 18 U.S.C. § 3297, permits indictment within five years of that testing regardless of whether the limitation period otherwise applicable to the offense has already expired; and (2) whether the Confrontation Clause of the Sixth Amendment, *see Bruton v. United States*, 391 U.S. 123 (1968), or the Due Process Clause of the Fifth Amendment prohibits use of the nontestimonial statements of a nontestifying criminal defendant against his codefendant in a joint trial. Diosme Fernandez Hano and Reinaldo Arrastia-Cardoso were convicted of Hobbs Act robbery and conspiracy to commit Hobbs Act robbery, 18 U.S.C. § 1951(a), (b)(1), for the robbery of $1.7 million from an armored truck. Hano argues that his indictment was returned after the applicable limitation period expired and that the later discovery of his DNA could not revive the running of the limitation period. Arrastia-Cardoso contends that the district court should have prohibited Ruben Borrego Izquierdo, to whom Hano admitted his crimes, from testifying. Hano also challenges a few of the evidentiary rulings, argues that insufficient evidence supports his convictions, and challenges the enhancement of his sentence for "otherwise using" a dangerous weapon in the robbery. Arrastia-Cardoso also

2

contends that the government improperly commented on his decision not to testify during closing arguments. All these arguments fail. We affirm.

## I. BACKGROUND

On November 30, 2009, Hano and Arrastia-Cardoso robbed a Brink's armored truck outside of the Fifth Third Bank in Fort Myers, Florida. The operators of the truck that day were Jimmy Ortiz and Bernard Meaney. Ortiz served as the truck's messenger and Meaney was the driver.

Both the driver and the messenger on a Brink's armored truck are armed with guns. The messenger's primary role is to get in and out of the truck to collect and deliver currency, but he also is in command of the operation and supervises the driver. The messenger uses a route guide—a confidential list that includes stops, arrival and departure times, and the number of pieces to pick up or deliver—but he has the authority to amend the guide and add stops, including food or restroom breaks.

An armored wall with a bulletproof window partitions the driver's cabin from the back of the truck. The messenger sits with currency in a cabin in the back of the truck. The partition between the two cabins contains a gun port that allows the driver to shoot into the messenger's cabin in the event of a robbery.

On the day of the robbery, Ortiz and Meaney picked up currency from several businesses, including a casino where the value of pickups ordinarily ranged

3

between $1 million and $1.5 million. The Fifth Third Bank was the last scheduled stop of the day. Before reaching the bank, Ortiz decided that they should stop at a Burger King. Only Ortiz went inside. In spite of a zero-tolerance policy forbidding carrying cellphones on runs, Ortiz was carrying a cellphone. After spending six or seven minutes at Burger King, they continued to the Fifth Third Bank, which was roughly 30 minutes away.

Immediately after they arrived at the bank and Ortiz stepped out of the truck, a man wearing a ski mask approached Ortiz from behind, put an arm around his neck, held a gun to his head, and forced him back into the truck. Meaney, who was watching through the window in the partition between the two cabins, reached for his gun, but Ortiz told him not to fire. Meaney was afraid for Ortiz's safety, so he obeyed and put his gun down. A second masked man entered the truck, grabbed bags of money, and exited. The man who had grabbed Ortiz struck his head with the butt of a gun.

One of the masked men then entered a red Pontiac Grand Prix parked behind the Brink's truck. Another masked man loaded the trunk of the Pontiac with money and began to enter the car. Meaney saw the Pontiac behind him, shifted the truck in reverse, and rammed the car. He then drove the truck forward and rammed the Pontiac again. One of those collisions caused the masked man who had loaded the

4

money into the trunk of the Pontiac to fall down, and his mask came off as he fell. That man rose and entered the car, which then sped away.

Eyewitness accounts established that either two or three men carried out the robbery. A bank customer who witnessed the robbery said she saw two men of Hispanic or Caucasian appearance. She described the man whose mask came off as appearing to be in his twenties to early thirties, standing around 5 feet 6 inches, with a medium to somewhat heavy-set build, and short brown hair and no facial hair. Meaney said that, in addition to seeing the face of the man whose mask came off, he saw another man without a mask standing 20 to 30 feet from the red car. That man stood near the scene of the robbery waiting to be picked up and then got into the car. Meaney described that man as 5 feet 10 inches, 180 pounds, medium build, dark, and with a full head of hair and a mustache. Meaney said that the man who had held Ortiz at gunpoint appeared to be Hispanic based on his skin tone. Ortiz asserted that he saw only the man who had struck him with the butt of his gun, but that he did not see that man's face.

Investigators found a ski mask and a plastic gun grip at the crime scene. The gun grip did not have screws used on real firearms and likely came from a fake gun. An analyst tested the ski mask and the gun grip for the presence of DNA. The analyst discovered a major profile on the outside of the mask and on the gun grip. A major profile exists when there is significantly more DNA from one contributor

5

than any other in the mixture of DNA recovered and makes it possible to identify that contributor.

On the night of the robbery, investigators found the red Pontiac abandoned in a parking lot at a business near the Fifth Third Bank. The vehicle identification number plate had been removed from the car and the vehicle identification number on another part of the car had been scratched out. Investigators later learned that a Tampa mechanic named Camilo Hernandez had sold the vehicle to Arrastia-Cardoso in the month when the robbery took place. Another person had driven Arrastia-Cardoso to buy the car, but Hernandez did not see who the driver was.

The investigators initially suspected that Ortiz and a man named Mariano Duarte-Cardoso had been involved in the robbery. Duarte-Cardoso, who investigators later learned to be Arrastia-Cardoso's cousin and the spouse of Ortiz's sister, fled the country after a search of his home. At that time, the investigators were not focused on Hano or Arrastia-Cardoso.

Five years later, in September 2014, Ruben Borrego Izquierdo, who was facing unrelated state charges, came to the Federal Bureau of Investigation with information. Borrego Izquierdo stated that he grew up in the same village in Cuba with Hano and had known him for decades. Hano had recently told Borrego Izquierdo that he had robbed an armored truck with a man named "Reinaldo Arrastia" in 2009. Hano said that the plot to rob the truck included one of the

6

truck's guards, who was part of Arrastia's family, and included a cousin of Arrastia. Hano also described some of the key details of the robbery: that he had left the scene in a car he had purchased from Camilo Hernandez, that he had removed the vehicle identification number from the car, that he had taken the money from the robbery back to Cuba in a speedboat, and that he had spent the money on two houses and a car.

Borrego Izquierdo's story included details about the crime that had not been made public. No law enforcement agency had made known, for example, that the getaway car had been purchased in Tampa or that the vehicle identification number of the car had been removed. And investigators were able to corroborate Borrego Izquierdo's assertion that Hano traveled to Cuba after the robbery through a sworn statement that Hano provided to a border officer. In the statement, Hano said that he moved to the United States in 2008, but that in January 2010—a little more than a month after the robbery—he traveled to Cuba on a boat that departed from Texas. Hano returned to the United States in 2014.

After investigators heard Borrego Izquierdo's story, Arrastia-Cardoso and Hano became the primary suspects in the investigation. In 2015, federal investigators obtained DNA samples from them. Hano's DNA matched the major DNA profile from the ski mask. Arrastia-Cardoso's DNA matched the major profile on the gun grip. And the government's analyst determined that, for each

7

major DNA profile, the probability that the profile would match the DNA of a random person (the "random-match probability") was less than one in 700 billion.

On March 16, 2016, the United States indicted Hano and Arrastia-Cardoso for Hobbs Act robbery and conspiracy to commit Hobbs Act robbery. The jury convicted both men on all charges. Hano's presentence investigation report recommended a five-level enhancement to his offense level because he brandished or otherwise possessed a firearm during the robbery, United States Sentencing Guidelines Manual § 2B3.1(b)(2)(C) (Nov. 2015), when the defendants apparently disarmed Ortiz and stole his gun. Hano objected to this enhancement on the ground that the evidence at trial established only that the defendants used a fake gun to effectuate the robbery. He conceded that the Guidelines treat a fake gun as a "dangerous weapon," but argued that he should instead receive only a three-level enhancement for brandishing a weapon in the course of the offense, *id.* § 2B3.1(b)(2)(E). The district court applied a four-level enhancement because a dangerous weapon had been "otherwise used" during the robbery, *id.* § 2B3.1(b)(2)(D). The district court sentenced Hano to serve 121 months of imprisonment and Arrastia-Cardoso to 120 months of imprisonment.

## II. STANDARD OF REVIEW

This appeal is governed by three standards of review. First, we review *de novo* the interpretation and application of a statute of limitations. *United States v.*

8

*Farias*, 836 F.3d 1315, 1323 (11th Cir. 2016). The same standard applies to alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). *United States v. Brester*, 786 F.3d 1335, 1338 (11th Cir. 2015). We also review the denial of a motion for a judgment of acquittal for insufficiency of the evidence *de novo*. *United States v. Flanders*, 752 F.3d 1317, 1329 (11th Cir. 2014). And although we review a district court's factual findings in applying the Sentencing Guidelines for clear error, we review the application of the guidelines to those facts *de novo*. *United States v. Bradley*, 644 F.3d 1213, 1283 (11th Cir. 2011). Second, "[w]e review a district court's evidentiary rulings for an abuse of discretion." *United States v. Eckhardt*, 466 F.3d 938, 946 (11th Cir. 2006). And we review the denial of a motion for a new trial based on the weight of the evidence for "clear abuse" of discretion. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). Third, we review issues not raised in the district court for plain error. *United States v. Taohim*, 817 F.3d 1215, 1224 (11th Cir. 2013). "For there to be plain error, there must (1) be error, (2) that is plain, and (3) that affects the substantial rights of the party, and (4) that seriously affects the fairness, integrity, or public reputation of a judicial proceeding." *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002).

9

## III. DISCUSSION

We divide our discussion in six parts. First, we reject Hano's argument that the indictment against him was not returned within the applicable limitation period. Second, we explain that the evidentiary issues raised by Hano and Arrastia-Cardoso do not merit reversal. Third, we explain that Hano has failed to establish that the denial of his motion to obtain the DNA profile of Mariano Duarte-Cardoso resulted in any prejudice. Fourth, we reject Hano's argument that the government failed to produce sufficient evidence to support his convictions. Fifth, we conclude that the government did not improperly comment on Arrastia-Cardoso's decision not to testify. And sixth, we explain that Hano "otherwise used" a dangerous weapon in the commission of the robbery so the district court was warranted in applying the four-level enhancement to his sentence.

*A. The Indictment Was Returned Within the Applicable Limitation Period.*

Before trial, Hano moved to dismiss the indictment on the ground that it was not returned within the five-year limitation period ordinarily applicable to federal noncapital crimes, 18 U.S.C. § 3282(a). The district court denied the motion and ruled that the indictment fell within a statutory exception for cases in which DNA testing implicates a person in a felony, *id.* § 3297. Section 3297 provides that "[i]n a case in which DNA testing implicates an identified person in the commission of a felony, no statute of limitations that would otherwise preclude prosecution of the

10

offense shall preclude such prosecution until a period of time following the implication of the person by DNA testing has elapsed that is equal to the otherwise applicable limitation period." The district court reasoned that this exception applied to Hano's indictment because DNA testing did not implicate him in the charged crimes until June 26, 2015, which left the government with five years to indict Hano after that date. Because the indictment was returned in March 2016, the district court concluded that the indictment was returned well within the limitations period of section 3297.

Hano argues that this ruling was in error based on the following application note to section 3297: "The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section if the applicable limitation period has not yet expired." Justice for All Act, Pub. L. No. 108–405, § 204(c), 118 Stat. 2260, 2271 (2004). Although the district court reasoned that section 3297 provided a new five-year limitation period that began when Hano was first implicated by DNA testing, Hano reads the application note—in particular, the conditional phrase "if the applicable limitation period has not yet expired"—to mean that the exception to the ordinary limitation period applies to the prosecution of any offense committed after the date of enactment only if the otherwise applicable limitation period "has not yet expired" *at the time the defendant is implicated by DNA testing*. So on Hano's reading, the

11

implication of a defendant by DNA testing only *extends* a not-yet-elapsed limitation period.

The government contends that no error occurred based on the text of section 3297. And it argues that the application note only clarifies that section 3297 applies retroactively to any offense so long as the limitation period applicable to an offense by default had not yet expired *at the time of enactment*. We agree with the government.

Hano's argument would require us to disregard the plain meaning of section 3297, which provides that "no statute of limitations that would otherwise preclude prosecution of the offense shall preclude such prosecution until a period of time *following the implication of the person by DNA testing* has elapsed that is equal to the otherwise applicable limitation period." This language makes clear that a period of time "equal to the otherwise applicable limitation period" will run from "the implication of the person by DNA testing" regardless of whether the implication occurred within the ordinarily applicable limitation period. If Hano were right about the import of the application note, the codified text of section 3297 would instead say that no statute of limitations will preclude prosecution until a period of time has elapsed that is equal to the otherwise applicable limitation period *if the person is implicated by DNA testing while the otherwise applicable limitation period continues to run*. But that is not what the statute says, and "our

12

constitutional structure" does not permit us "to 'rewrite the statute that Congress has enacted.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016) (quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005)).

Hano misreads the application note. The competing interpretations of the application note turn on the implicit temporal reference of the expression "has not yet expired," a verbal phrase in the present-perfect tense. The present perfect "denotes an act, state, or condition that is now completed or continues up to the present." Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 97 (2016). In the application note, the condition that "continues up to the present" is that the normal limitation period for an offense has not yet expired. And the most natural reading of the note is that the time up to which the limitation period's failure to expire continues is the time of enactment. After all, the conditional phrase directly follows a reference to "the date of the enactment of this section."

Indeed, the text of the application note does not provide any other plausible temporal anchor for the conditional clause. The note refers directly to three events: the "commi[ssion]" of "an[] offense," "the prosecution of [the] offense," and "the enactment of this section." Of the options in the text of the application note, only "the date of the enactment" makes sense as a temporal point of reference for the conditional clause. It makes no sense to say that section 3297 would apply unless

13

the limitation period expired the very same moment the offense was committed. And if the conditional clause were linked in time to the prosecution of the offense, then the application note would mean that section 3297 would apply only when a defendant was prosecuted within the original limitation period—a situation in which the extended period of section 3297 would have no work to do.

Hano does not argue that either the time of the prosecution or the time of the commission of the offense frames the conditional clause, but his preferred candidate—the time the defendant is implicated by DNA testing—is no more attractive. *That* event is described in section 3297, not the application note, so it would be unusual if it supplied the temporal reference point for the present-perfect verb in the application note. Such a reading might make sense if the application note incorporated section 3297 by reference in a way that also incorporated its temporal framework. But the application note does not do so. To be sure, the application note defines the circumstances in which section 3297 "shall apply." But the point is that the application note is a distinct sentence and stands on its own temporal ground. Nothing in the text or context of the application note provides any reason to think that the "present" to which the present-perfect phrase "has not yet expired" refers is any time other than that contemporaneous with the enactment of the text by Congress.

14

Our interpretation of section 3297 and the application note is also supported by persuasive authority. Hano cites no authority in support of his reading, and as the government points out, our sister circuits have consistently applied section 3297 even when the otherwise applicable limitation period has already expired. *See United States v. Lopez*, 860 F.3d 201, 206–07 (4th Cir. 2017) (applying section 3297 when crime occurred in February 2007 and DNA match occurred over five years later in June 2012); *United States v. Sylla*, 790 F.3d 772, 772–73 (7th Cir. 2015) (involving 2003 crime and 2010 DNA match); *United States v. Hagler*, 700 F.3d 1091, 1094 (7th Cir. 2012) (involving 2000 crime and 2008 DNA match).

Hano argues that our interpretation of the note threatens to read the word "after" out of the note in violation of the surplusage canon, which instructs us to give effect to every word in a provision if possible and to refrain from assigning an interpretation to a provision that causes a word "to have no consequence." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 26, at 174 (2012). The note says that section 3297 shall apply to the prosecution of an offense "committed before, on, *or after* the date of the enactment" of the section "if the applicable limitation period has not yet expired." And Hano points out that obviously no limitations period for an offense committed *after* the enactment of the statute could have already expired *at the time when the statute was enacted*.

15

Hano's argument misses the mark. The word "after" in the application note is not devoid of legal effect. If the application note provided only that section 3297 "shall apply to the prosecution of any offense *before or on* the date of the enactment of this section if the applicable limitation period has not yet expired," the note would create the impression that section 3297 does not apply to offenses committed after the date of enactment. The inclusion of the word "after" in the note eliminates this misleading impression. True, the conditional clause of the note, which says that section 3297 applies "if the applicable limitation period has not yet expired," is necessarily satisfied when an offense was committed after the date of enactment. But that consequence does not render the word "after" or the conditional clause superfluous. The conditional clause—in conjunction with the word "before"—clarifies that section 3297 applies retroactively to offenses committed before the date of enactment if the otherwise applicable limitation period has yet to expire. The word "after" makes plain that section 3297 has prospective application. Both the word "after" and the conditional clause are necessary to clarify the full scope of application of section 3297.

Consider too the legal context of the enactment of section 3297 and its application note. Section 3297 was enacted in 2004, only one year after the Supreme Court held in *Stogner v. California*, 539 U.S. 607 (2003), that "a law enacted after expiration of a previously applicable limitations period violates the

16

*Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution." *Id.* at 632–33. *Stogner* explicitly distinguished a law that revives a prosecution that was previously precluded by the applicable statutory-limitation period from a statute that merely "extend[s] time limits for the prosecution of future offenses, or for prosecutions not yet time barred." *Id.* at 632. The language of the application note covers both categories of prosecutions while clarifying that section 3297 does not purport to revive prosecutions for offenses with limitation periods that had already expired when the statute was enacted. Instead of permanently limiting the operation of section 3297 to the extension of limitation periods still running when DNA testing implicates a suspect, the application note appears tailor-made to avoid the constitutional problem that would have resulted under *Stogner* if Congress had sought to apply section 3297 retroactively to renew limitation periods that had elapsed before the time of enactment. As a result, we conclude that the district court did not err in ruling that the indictment was returned within the limitation period applicable under section 3297.

B.  *The Evidentiary Issues Raised by Hano and Arrastia-Cardoso Do Not Merit Reversal.*

Hano and Arrastia-Cardoso challenge three evidentiary rulings. First, they argue, on different grounds, that the district court erred in permitting Borrego Izquierdo to testify about his conversation with Hano who revealed that he participated in the robbery and that Arrastia-Cardoso was one of his

17

coconspirators. Second, Hano contends that the district court should not have permitted the government to introduce evidence that he traveled to Cuba shortly after the robbery. Third, Hano argues that the district court erred in ruling that the government could introduce DNA evidence obtained from the getaway vehicle even though the government ultimately decided not to introduce that evidence at trial. None of their arguments have merit.

1. The District Court Did Not Err in Permitting Borrego Izquierdo to Testify.

Arrastia-Cardoso contends that the admission of Hano's statements to Borrego Izquierdo violated his rights under *Bruton*, but Hano's statements were nontestimonial, which means they are beyond the scope of the *Bruton* doctrine. *Bruton* held that the Confrontation Clause prohibits the use of the confession of a nontestifying criminal defendant in a joint trial if the statement directly inculpates a codefendant, although it may be otherwise admissible against the confessing defendant. 391 U.S. at 126. And *Crawford v. Washington*, 541 U.S. 36 (2004), held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant ha[s] had a prior opportunity for cross-examination." *Id.* at 53–54. The Supreme Court has since clarified that the Confrontation Clause prohibits *only* the introduction of testimonial hearsay statements. *See Whorton v. Bockting*, 549 U.S. 406, 419–20 (2007) ("Under *Crawford*, . . . the Confrontation

Clause has no application to [out-of-court nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability."); *Davis v. Washington*, 547 U.S. 813, 823–24 (2006) (same).

We have yet to hold in a published opinion that *Bruton* applies only to testimonial statements, but every one of our sister circuits to consider the issue has so held, *see Lucero v. Holland*, 902 F.3d 979, 987–88 (9th Cir. 2018); *United States v. Clark*, 717 F.3d 790, 816 (10th Cir. 2013); *United States v. Berrios*, 676 F.3d 118, 128–29 (3d Cir. 2012); *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009); *United States v. Avila Vargas*, 570 F.3d 1004, 1008–09 (8th Cir. 2009), and for good reason. The *Bruton* rule "presupposes that the aggrieved co-defendant has a Sixth Amendment right to confront the declarant in the first place." *Figueroa-Cartagena*, 612 F.3d at 85. If no co-defendant "has a constitutional right to confront the declarant, none can complain that his right has been denied." *Id.* So the same principles that govern whether the admission of testimony violated the Confrontation Clause control whether the admission of the statements of a nontestifying codefendant against a defendant at a joint trial violate *Bruton*. As a result, "[t]he threshold question in every case" raising a *Bruton* issue "is whether the challenged statement is testimonial." *Id.* If it is not, the Confrontation Clause

19

does not apply. So the admission of Hano's statements through Borrego Izquierdo could have violated the rule of *Bruton* only if those statements were testimonial.

Hano's statements as related by Borrego Izquierdo were plainly nontestimonial. Statements made in the course of an out-of-court conversation are "testimonial" if "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). When Hano spoke with Borrego Izquierdo, no future prosecution was on the horizon. Hano was not presently under investigation and had no reason to believe that his statements to Borrego Izquierdo would ever be used in court. Borrego Izquierdo likewise had no ground to suspect that he would ever testify against Hano. What transpired between them was a friendly and informal exchange in which Hano happened to reveal evidence that would ultimately be critical to the government's case when Borrego Izquierdo decided to come forward years after the robbery.

In the alternative, Arrastia-Cardoso argues that we should adopt a rule that would extend the rule of *Bruton* to nontestimonial statements on procedural-due-process grounds. The government responds by arguing that plain-error review applies to Arrastia-Cardoso's alternative argument because he objected to Borrego Izquierdo's testimony on the basis of the Confrontation Clause, not the Due

20

Process Clause. And the government argues that Arrastia-Cardoso's proposed rule is not clearly established as the law of this Circuit. *United States v. Hesser*, 800 F.3d 1310, 1325 (11th Cir. 2015) ("'Plain' error means that the legal rule is clearly established at the time the case is reviewed on direct appeal.").

We conclude that there was no due-process error—plain or otherwise—in the admission of Borrego Izquierdo's testimony. In the substantive-due-process context, the Supreme Court has explained that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (alteration adopted) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989); *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019). We see no reason why the same logic would not apply to procedural-due-process claims.

Under Arrastia-Cardoso's theory, the Due Process Clause would provide defendants with a right to confront witnesses more expansive than the right secured by the Confrontation Clause itself, reducing the Confrontation Clause to surplusage. In the Bill of Rights, the "Framers sought to restrict the exercise of arbitrary authority by the [g]overnment in particular situations." *Albright*, 510 U.S.

21

at 273 (plurality opinion). If the Due Process Clause contained all the protections of the Confrontation Clause and more, the Framers' decision to include that Clause in the Sixth Amendment would be mysterious. And needless to say, there is no reason to believe that the drafters of the Sixth Amendment included the Confrontation Clause "out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach." Scalia & Garner, *supra*, at § 26, at 177. As a result, "[w]e must analyze the claim under the standard appropriate to that specific provision, not under the rubric of" procedural due process. *Echols*, 913 F.3d at 1326 (alterations adopted) (citation and internal quotation marks omitted). And as we have explained, Arrastia-Cardoso's argument under the Confrontation Clause fails.

Arrastia-Cardoso's due-process theory would also render meaningless the limitation of *Crawford* and its progeny of the confrontation right to "testimonial statements of a witness" who "was unavailable to testify" where the defendant did not have "a prior opportunity for cross-examination." 541 U.S. at 53–54. On Arrastia-Cardoso's view, the bare fact that a defendant cannot ordinarily subject his codefendant's out-of-court statement to the rigors of cross-examination in a joint trial renders the statement inadmissible at trial, regardless of whether the statement was testimonial. But the apparent rationale for this proposed rule—that the admission of an out-of-court statement inherently deprives a defendant of a fair

22

trial if he had no opportunity to cross-examine the declarant—applies with equal force to statements of unavailable witnesses who are not codefendants at a joint trial. So Arrastia-Cardoso's theory—taken to its logical conclusion—would mean that the Due Process Clause prevents the introduction of any and all out-of-court statements at a criminal trial if the defendant did not have "a prior opportunity for cross-examination." *Id.* This theory would allow a defendant to avoid *Crawford*'s limitation of the confrontation right to testimonial statements by the simple expedient of labeling their claims under the Confrontation Clause as claims under the Due Process Clause. We will not adopt a rule that would permit defendants to make an end run around the strictures recognized by the Supreme Court's Confrontation Clause jurisprudence.

Arrastia-Cardoso also contends, albeit very briefly, that Hano's statement should have been excluded as inadmissible hearsay, but he is mistaken. The district court overruled Arrastia-Cardoso's objection to the admission of this statement on hearsay grounds and concluded that Hano's statement was admissible as a statement against interest under Federal Rule of Evidence 804(b)(3). On appeal, Arrastia-Cardoso concedes that "Hano's confession to his role in the robbery was against his own penal interest," but argues that "the balance of the statement remains hearsay inadmissible in accordance with [Federal Rule of Evidence] 802." In support of this contention, he relies on the principle that Rule 804(b)(3) "does

23

not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 600–01 (1994). But Arrastia-Cardoso does not even attempt to identify any portion of Hano's statement that was not self-inculpatory, nor does he attempt to prove that the introduction of portions of Hano's statement that were not self-inculpatory prejudiced him, so we cannot reverse on this basis. *See United States v. Khanani*, 502 F.3d 1281, 1292 (11th Cir. 2007) ("No reversal will result if sufficient evidence uninfected by any error supports the verdict, and the error did not have a substantial influence on the outcome of the case." (citation and internal quotation marks omitted)).

For his part, Hano offers a third challenge to Borrego Izquierdo's testimony, arguing that it should have been excluded as prejudicial under Federal Rule of Evidence 403, but his argument fails as well. Under Rule 403, a district court has the discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." According to Hano, the district court should have prohibited Borrego Izquierdo from testifying altogether because he was not credible. But "Rule 403 does not permit exclusion of evidence because the judge does not find it credible." *United States v. Thompson*, 615 F.2d 329, 333 (5th Cir. 1980) (rejecting the argument that

24

Rule 403 gave the district court the authority to "protect" the jury from a witness's "contradictory testimony"). Credibility determinations are the "exclusive province" of the jury "and the court of appeals may not revisit this question unless it is incredible as a matter of law." *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) (citation and internal quotation marks omitted). Testimony is incredible as a matter of law if and only if it is "unbelievable on its face, i.e., testimony as to facts the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." *Id.* (citation and internal quotation marks omitted). Nothing of the kind could be fairly said of Borrego Izquierdo's testimony.

Hano also asserts that Borrego Izquierdo's testimony that Hano purchased two houses and a car in Cuba after the robbery should have been excluded because it was uncorroborated and appealed to class prejudice, but we disagree. Rule 403 does not license exclusion of evidence for want of corroboration, and "evidence of wealth or extravagant spending may be admissible when relevant to the issues in the case and where other evidence supports a finding of guilt." *Bradley*, 644 F.3d at 1271. The evidence of Hano's expenditures was relevant because it buttressed the inference that Hano had recently come into a large sum of money when he set sail for Cuba. The evidence was not admitted for the purpose of enticing the jury to convict Hano based on his wealth or socioeconomic status, and the government

25

never attempted to suggest anything along those lines. So Hano's argument fails to establish that the district court erred in permitting Borrego Izquierdo to testify.

## 2. The District Court Did Not Err in Admitting Evidence that Hano Left the United States for Cuba After the Robbery.

Before trial, Hano filed a motion in limine to exclude any evidence of his travel between the United States and Cuba, including his immigration file and the statement he made to a border officer in which he explained that he left for Cuba on a boat that departed from Texas in January 2010. Hano argued that the evidence should be excluded as prejudicial under Rule 403 and excluded under Rule 404(b) on the theory that "testimony regarding the details of [Hano's] immigration to and from the United States and Cuba may be considered a 'bad act.'" The district court denied the motion in part and granted it in part. It ruled that Rule 404(b) did not apply because Hano failed to establish that his entry into the United States was wrong or related to his character and that Hano's statement to the border officer concerning the timing and means of his exodus to Cuba had significant probative value that was not outweighed by the danger of unfair prejudice. The district court excluded all portions of Hano's immigration file that lacked clear probative value. At trial, the government introduced a redacted copy of Hano's immigration file and offered testimony from the border officer regarding Hano's statement about his travel to Cuba.

26

Hano argues that this evidence should have been excluded under Rule 403 because the evidence transformed a "case about a robbery and conspiracy" into "a case about immigration," but he is wrong. As the district court correctly concluded, "the timing of Hano's departure to Cuba, which was little more than a month after the robbery, as well as his description of the means and method of that departure" was probative of his "motivation to move between countries in the immediate aftermath of a crime" and "the potential avenue" by which he transported his "ill-gotten gains."

Hano's only argument for the existence of prejudice relies on a state-court opinion asserting that "[q]uestions regarding a defendant's immigration status are . . . irrelevant and designed to appeal to the trier of fact's passion and prejudice and are thus generally improper areas of inquiry," *Washington v. Avendano-Lopez*, 904 P.2d 324, 331 (Wash. Ct. App. 1995), but the government never suggested that Hano was illegally present in the United States. Indeed, the border officer testified that Hano legally entered the United States when he moved to this country in 2008 and in 2014 when he returned from his sojourn in Cuba. The government never invited the jury to find Hano guilty on the basis of immigration status. The import of the evidence about his travel was clear: it established that Hano was indeed in Cuba after the robbery, as Borrego Izquierdo testified, and that he had traveled there on a private person's boat that sailed from Texas—an unusual means of

27

international travel that might be appealing if one were carrying hundreds of thousands of dollars obtained by a robbery.

Hano's argument under Rule 404(b) fares no better. Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 404(b)(2) clarifies that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." We have explained that Rule 404(b) is a rule "of inclusion which allows extrinsic evidence unless it tends to prove only criminal propensity." *United States v. Sanders*, 668 F.3d 1298, 1314 (11th Cir. 2012). And the government made no attempt to use the evidence of Hano's travel to Cuba to prove that he had a propensity to cross the border unlawfully or otherwise violate the law. The purpose of the evidence was to show that, on a particular occasion, Hano fled the United States with the proceeds of the robbery. The district court acted well within its discretion in denying Hano's motion to exclude the evidence of when and by what means he traveled to Cuba.

   3.  The Question Whether the District Court Abused its Discretion in Denying Hano's Motion to Prohibit DNA Evidence from the Getaway Car Is Moot.

Before trial, Hano moved to exclude DNA evidence obtained from the getaway car that purportedly established that he was a possible contributor to the

28

DNA sample obtained from the car. Hano argued that the introduction of this evidence would violate his rights under *California v. Trombetta*, 467 U.S. 479 (1984), because the government had destroyed the car and Hano would have no capacity to test the vehicle. The district court denied this motion because local investigators destroyed the car before Hano became a suspect, the evidence had no exculpatory value at the time of its destruction, and Hano had failed to prove that the local investigators acted in bad faith in destroying the car. Nevertheless, the government never offered this evidence at trial.

Hano reiterates his challenge to this ruling on appeal, but the issue is now moot. *See United States v. Diecidue*, 603 F.2d 535, 561 (5th Cir. 1979) ("Since the Government did not introduce these items into evidence, the issue is moot."). As a result, we have no authority to examine the merits of this ruling. *See Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) ("Any decision on the merits of a moot case or issue would be an impermissible advisory opinion." (citation and internal quotation marks omitted)).

Hano argues that the officer who examined the getaway car mentioned in her trial testimony that she looked for and attempted to collect DNA samples from the vehicle, but the officer gave no indication of the result of the analysis of the samples or suggested that the samples implicated Hano in the robbery in any way. Instead, she stated only that she "look[ed] for touch DNA" samples and that

29

"[t]ouch DNA swabs were collected off of the exterior and interior" of the vehicle. These incidental references did not introduce the DNA analysis challenged by Hano in his pretrial motion.

### C. The District Court Correctly Denied Hano's Motion to Obtain the DNA Profile of Mariano Duarte-Cardoso.

Hano filed a pretrial motion for the district court to issue a nonparty subpoena to the Federal DNA Database Unit for the DNA profile of Mariano Duarte-Cardoso—Arrastia-Cardoso's cousin and the spouse of Ortiz's sister. Duarte-Cardoso's DNA profile was in the database because of an earlier unrelated conviction. Hano argued that he had a right to access Duarte-Cardoso's profile under *Brady*, because the DNA of other "potential donors" had been discovered on the ski mask recovered from the crime scene, and in Hano's view, the profile "could potentially exculpate [him] . . . by further inculpating [Duarte-]Cardoso." The government opposed the motion on the ground that federal privacy protections prohibited the disclosure of Duarte-Cardoso's DNA profile and that his profile was not exculpatory because even if his DNA was on the ski mask, it would do nothing to explain away the presence of Hano's DNA on the mask. The district court held a hearing on the motion in which a supervisor of the Federal DNA Database Unit testified. The district court denied Hano's motion because even if Duarte-Cardoso's DNA were found on the ski mask, it "could not conceivably impact a trial."

On appeal, Hano reiterates his argument that the government's failure to produce Duarte-Cardoso's DNA profile violated *Brady*, but the district court was right to reject it. "To establish a *Brady* violation," a defendant must "prove that the prosecution withheld favorable evidence and that he was prejudiced as a result." *Brester*, 786 F.3d at 1339. To establish prejudice, a defendant must "prove that there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Hano cannot prove prejudice.

As the government argues, even if Hano had Duarte-Cardoso's profile, he would be unable to prove that Duarte-Cardoso's DNA was on the ski mask. The evidence established that Hano was the source of the only major DNA profile on the mask. At most, Hano could have attempted to prove that Duarte-Cardoso was a possible contributor to a mixture of DNA found on the mask, but as the government's expert explained, "the frequency of the occurrence of the mixed DNA profile" obtained from the mask in the general population of "unrelated individuals" was such that "approximately one in six individuals" would have "a DNA profile that could be included in that mixture." So although a comparison of Duarte-Cardoso's profile with the mixed profile derived from the mask could have

31

*excluded* Duarte-Cardoso as a contributor of DNA to the mask, it could not have proved that his DNA was present on the mask.

More importantly, even if Hano were somehow able to prove that Duarte-Cardoso's DNA was on any of the evidence obtained from the crime scene, the most it would have proved was that Duarte-Cardoso had also come into contact with those items. This conclusion would do nothing to undermine the principal value of the DNA evidence, which was to prove that *Hano* had worn the mask. If anything, the presence of Duarte-Cardoso's DNA on the mask would have corroborated Hano's admission to Borrego Izquierdo that Arrastia-Cardoso's cousin had been involved in the conspiracy. So Hano has failed to establish the existence of a "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

Hano also argues for the first time on appeal that the government violated Federal Rule of Criminal Procedure 16, which requires the government to disclose items that are "material to preparing the defense" if they are "within the government's possession, custody, or control," Fed. R. Crim. P. 16(E)(i), but this argument fails for the same reasons as Hano's argument based on *Brady*. As we have explained, a defendant must prove "prejudice to substantial rights" to establish that a violation of Rule 16 warrants reversal. *United States v. Mosquera*,

886 F.3d 1032, 1045 (11th Cir. 2018). For the reasons discussed above, Hano cannot establish that the failure to produce the profile was prejudicial.

### D. The District Court Did Not Err in Denying Hano's Motions for a Judgment of Acquittal and for a New Trial.

Hano argues that the district court erred in denying his motions for a judgment of acquittal and for a new trial. "When conducting the review of the record" to determine "[w]hether the record contains sufficient evidence to support the jury's verdict," "we view 'the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict.'" *United States v. To*, 144 F.3d 737, 743 (11th Cir. 1998) (quoting *United States v. High*, 117 F.3d 464, 467 (11th Cir. 1997)). "We must uphold the jury's verdict whenever a reasonable factfinder could conclude that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 743–44.

Hano contends that there was insufficient evidence that he was one of the robbers, but the evidence amply supports the jury's finding. Hano admitted to committing the crime with Arrastia-Cardoso to Borrego Izquierdo. Hano's DNA matched the only major DNA profile on the ski mask recovered from the crime scene. Shortly after the robbery, Hano traveled to Cuba under suspicious circumstances. And the evidence that independently implicated Arrastia-Cardoso in the robbery—for example, that his DNA was on the gun grip found at the scene of the robbery and that he purchased the getaway car from Camilo Hernandez—

33

also tended to establish Hano's guilt because it corroborated his admission to Borrego Izquierdo that he had robbed the armored truck with Arrastia-Cardoso.

Hano responds that the three eyewitnesses to the robbery were unable to say with certainty that he was one of the robbers, but the failure of the witnesses to conclusively identify someone they had only seen for a brief moment years earlier hardly suffices to undermine the jury's inference of guilt. One of the witnesses, Ortiz, said that he never saw the face of the robber who held an apparent gun to his head because he was wearing a mask, so it is unsurprising that he could not identify Hano at trial. The second witness who saw one of the robbers—a bank customer—disclaimed any ability to conclusively identify the man she saw because it had "been a very long time." But she did describe the robber as a "Caucasian male or light Hispanic male" who was "a little heavy set" and had "short brown hair" and no facial hair, and this description appears to match Hano well.

True, the third witness who saw the robber, Meaney, gave a different description. He said that the robber was "dark," had a "full head of hair," and a "mustache," but this discrepancy does not undermine the jury's verdict. Meaney saw the robber from 20 to 30 feet away and was in the midst of a stressful encounter with apparently armed robbers—and he had, after all, just rammed the getaway car and was "winded . . . because of the impact." It is also entirely

34

possible that the robber Meaney described was not Hano, but instead one of the other robbers. After all, he testified that there were probably three different robbers. And in any case, in the light of the DNA evidence, Borrego Izquierdo's testimony, and one apparently positive witness identification, the jury could have reasonably found that Hano was one of the robbers even if it discounted Meaney's identification.

Hano also argues that Borrego Izquierdo's testimony did not provide a reasonable basis for the jury to reach any finding regarding his involvement in the robbery because that testimony was "resoundingly impeached" on cross-examination, but this argument fails. The "uncorroborated testimony of an accomplice is sufficient to support a conviction in the Federal Courts if it is not on its face incredible or otherwise insubstantial." *United States v. LeQuire*, 943 F.2d 1554, 1562 (11th Cir. 1991) (citation and internal quotation marks omitted). Borrego Izquierdo's testimony was not incredible on its face and was supported by powerful corroborating evidence, so the jury was entitled to render its own assessment of Borrego Izquierdo's credibility. As we have explained, "[t]o the extent that" a defendant's "argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit this question." *United States v. Kelley*, 412 F.3d 1240, 1247 (11th Cir. 2005) (citation and internal quotation marks omitted).

35

Hano also contends that the evidence was insufficient to support his conviction for Hobbs Act robbery because it failed to establish that he took property "by means of actual or threatened injury," but we are not persuaded. "The two required elements for a substantive Hobbs Act conviction are robbery and an effect on interstate commerce." *United States v. Taylor*, 480 F.3d 1025, 1026–27 (11th Cir. 2007) (alteration adopted) (citation and internal quotation marks omitted). Robbery is defined as including "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will" through "actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property . . . of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1). As Hano sees it, the government failed to present sufficient evidence for the jury to infer that Hano seized the cash through "actual or threatened force, or violence, or fear of injury" because Ortiz was an inside man who was never actually threatened with violence and Meaney "was located behind a glass division" and "testified to the jury that he was only concerned for Ortiz's safety." Although Meaney is apparently a brave man—he did ram the getaway car repeatedly in an effort to disable it—it is a stretch to say that the robbers did not at least implicitly threaten his safety by apparently threatening Ortiz's life, and this threat enabled the robbers to effectuate their crime without

36

interference by deterring Meaney from leaving the cabin or using his weapon against them. And, in any event, so long as Meaney reasonably believed that Ortiz's personal safety was threatened, it does not matter whether Ortiz was really in danger or not.

Third, Hano argues that the evidence was insufficient to support his conviction for conspiracy to commit Hobbs Act robbery because, in his view, the government failed to introduce any evidence that he had "ever met, spoke[n], or otherwise communicated" with Arrastia-Cardoso, but this argument fails. To prove a Hobbs Act conspiracy, the government must establish that: "(1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." *To*, 144 F.3d at 747–48. "[D]irect evidence of an agreement is unnecessary" to prove conspiracy. *United States v. McNair*, 605 F.3d 1152, 1195 (11th Cir. 2010). "Indeed, because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005) (citation and internal quotation marks omitted). And circumstantial evidence supported an inference that Hano committed a robbery in cooperation with Arrastia-Cardoso and perhaps other accomplices, and that the robbery required advance planning, including the purchase of guns,

37

masks, and a getaway car. These facts alone are sufficient to infer an agreement between Hano and Arrastia-Cardoso. And Hano's own statements, as related through Borrego Izquierdo, confirmed that he had planned and executed the robbery in conjunction with Arrastia-Cardoso and likely others. It follows that the evidence was sufficient to support both of Hano's convictions.

### E.  The Government Did Not Improperly Comment During Closing Argument on Arrastia-Cardoso's Decision Not to Testify.

Arrastia-Cardoso contends that the government impermissibly commented on his decision not to testify when, during closing arguments, the prosecutor mentioned that "while the burden of proof is not on the defendants to prove anything, there was actually no evidence introduced during the trial explaining an alternative reason why the DNA was on the items" recovered from the scene of the robbery. Arrastia-Cardoso did not object to this remark at trial, so we review for plain error. *United States v. Foley*, 508 F.3d 627, 637 (11th Cir. 2007). We conclude that Arrastia-Cardoso has failed to identify any error, plain or otherwise, resulting from this remark during closing arguments.

Because "the government in a criminal proceeding has the burden of proving every element of the charged offense beyond a reasonable doubt," "prosecutors must refrain from making arguments that improperly shift the burden of proof to the defendant." *United States v. Nerey*, 877 F.3d 956, 970 (11th Cir. 2017). "Nor may the prosecution comment on the defendant's failure to testify." *United States*

38

*v. Bernal-Benitez*, 594 F.3d 1303, 1315 (11th Cir. 2010). "A prosecutor impermissibly comments on a defendant's right to remain silent where: (1) the statement was *manifestly intended* to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. McGarity*, 669 F.3d 1218, 1241 (11th Cir. 2012) (citation and internal quotation marks omitted). "[T]he question is not whether the jury possibly or even probably would review the remark in this manner, but whether the jury *necessarily* would have done so." *Id.* (citation and internal quotation marks omitted). "A prosecutor's statements to the jury constitute misconduct only if: (1) the remarks were improper, and (2) the remarks prejudicially affected the substantial rights of the defendant." *Taohim*, 817 F.3d at 1224. "To warrant a new trial, there must be a reasonable probability that 'but for the remarks, the outcome would be different.'" *Id.* (citation omitted).

The government did not impermissibly comment on Arrastia-Cardoso's decision not to testify. It instead argued that the jury should infer that the most reasonable explanation of the presence of the defendants' DNA on the mask and gun grip recovered from the scene of the robbery was that the defendants used these items in committing the robbery because no evidence presented at trial undermined that explanation. A prosecutor is entitled to "comment 'on the failure

39

by defense counsel, as opposed to the defendant, to counter or explain evidence.'"

*Bernal-Benitez*, 594 F.3d at 1315 (quoting *United States v. Hernandez*, 145 F.3d

1433, 1439 (11th Cir. 1998)). And even if the jury might have "possibly" inferred

that the government was arguing that Arrastia-Cardoso should have taken the stand

himself and explained why his DNA was found on items recovered from the scene

of the robbery, we cannot say that the jury "necessarily" would have interpreted

the remark that way. *McGarity*, 669 F.3d at 1241. Arrastia-Cardoso's argument

fails because the government's "comment[] in closing arguments [was] made in the

context of the prosecutor's accurate reminder to the jury about the burden of proof"

and so "cannot establish plain error." *Foley*, 508 F.3d at 638.

### F. The District Court Did Not Err in Increasing Hano's Offense Level for "Otherwise Using" a Firearm During the Commission of the Robbery.

Hano argues that the district court erred in enhancing his offense level by

four levels because he "otherwise used" a dangerous weapon in the commission of

the robbery, U.S.S.G. § 2B3.1(b)(2)(D). The Sentencing Guidelines provide that

"if a dangerous weapon was otherwise used" in the commission of a robbery

offense, the defendant's offense level increases by four levels. *Id.* If a dangerous

weapon was only "brandished or possessed," the offense level increases by three

levels. *Id.* § 2B3.1(b)(2)(E). Under the definitions provided in the application notes

for the Guidelines, a defendant "brandished" a dangerous weapon if "all or part of

the weapon was displayed, or the presence of the weapon was otherwise made

40

known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." *Id.* § 1B1.1 cmt. n.1(C). A defendant "otherwise used" a dangerous weapon if the "conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." *Id.* § 1B1.1 cmt. n.1(I).

Hano argues that his conduct did not amount to anything more than brandishing a dangerous weapon because neither he nor his coconspirators ever actually threatened anyone with a weapon when they committed the robbery. According to Hano, because Ortiz was actually an "inside individual" who was in on the plot, when Ortiz pointed an apparent firearm at his head and struck him with it, that conduct was nothing more than an elaborate charade. Hano also argues that the weapon was only a "toy gun" and that he did not directly threaten anyone other than Ortiz. And although Meaney witnessed the whole sequence of events, Hano suggests that Meaney was only "a spectator to a performance in which Ortiz was acting as though he had been struck in order to assist in the robbery and avoid suspicion."

We conclude that Hano "otherwise used" a dangerous weapon in the commission of the robbery. Whether Hano used a toy gun is of no moment, as we have held that "defendants who otherwise use an object which appears to be a dangerous weapon will be subject to a four-level enhancement" under the relevant

41

guideline, *id.* § 2B3.1(b)(2)(D). *United States v. Miller*, 206 F.3d 1051, 1053 (11th Cir. 2000). The residual question is whether Hano's conduct amounted to more than "brandishing" a dangerous weapon, and the answer must be "yes." Our precedent establishes that the "use of a firearm to make an explicit or implicit threat against a specific person constitutes 'otherwise use' of the firearm." *United States v. Verbitskaya*, 406 F.3d 1324, 1339 (11th Cir. 2005).

The "key consideration" in applying the rule that pointing a weapon at a person and issuing a threat or order to facilitate the commission of an offense constitutes "otherwise using" a dangerous weapon is "whether a gun (or other weapon) was pointed at a specific person in an effort to create fear so as to facilitate compliance with a demand, and ultimately to facilitate the commission of the crime." *United States v. Yelverton*, 197 F.3d 531, 534 (D.C. Cir. 1999). The answer to this question does not depend on whether "the gun was pointed at the same person in whom fear was sought to be instilled, or even that the person sought to be coerced was the victim of the crime, as opposed to a third party whose complicity the perpetrator sought to ensure." *Id.* A perpetrator who points a gun at a person to coerce another into compliance with a criminal scheme has done more than merely "display[]" a weapon "to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." U.S.S.G. § 1B1.1 cmt. n.1(C).

42

Regardless of whether Hano actually intended to harm Ortiz when he put what appeared to be a gun to his head, Hano pointed what qualifies as a "dangerous weapon" under our precedent at a specific person, namely Ortiz, with the intent to cause Meaney to fear that Ortiz's safety would be endangered if Meaney failed to comply with Hano's demands. Hano's conduct amounted to "otherwise using" a dangerous weapon in the commission of the robbery, regardless of whether Ortiz or Meaney were actually in danger. *Cf. Yelverton*, 197 F.3d at 534 n.2 (explaining that threatening to "shoot one person in order to extort action from another" qualifies as otherwise using a dangerous weapon).

That said, Hano also implicitly threatened Meaney. An explicit threat to one person may constitute an implicit threat to others present if they reasonably believe in that circumstance that the same threat extends to them and that the perpetrator intends to secure their compliance with his demands through the use of the explicit threat against the third-party. *Cf. United States v. Douglas*, 489 F.3d 1117, 1129 (11th Cir. 2007) (holding that kidnapper's explicit threat to harm a child's mother was an implicit threat to the child because "he was unable to act independently of [her] and [she] believed that they were both in danger of physical harm"). The same rule should apply even if the explicit "threat" was only a mock threat. In either case, the perpetrator's conduct is calculated to induce compliance on the part of those who were not explicitly threatened through the use of an apparent threat

43

that communicates that those who fail to comply with his demands will be harmed. And under this rule, Hano's conduct amounted to "otherwise using" a dangerous weapon because his "threat" on Ortiz's life was calculated to induce Meaney's compliance by demonstrating that weapons would be used against any member of the crew of the truck who refused to comply with his demands. The district court committed no error when it enhanced Hano's offense level by four levels because he "otherwise used" a dangerous weapon in the robbery.

## IV. CONCLUSION

We **AFFIRM** the convictions and sentences of Hano and Arrastia-Cardoso.

44