[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11344
_____

D.C. Docket No. 9:14-cr-80081-DTKH-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH SIGNORE,

Defendant-Appellant.

_____

No. 16-11425
_____

D.C. Docket Nos. 9:14-cr-80081-DTKH-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAURA GRANDE-SIGNORE,
PAUL LEWIS SCHUMACK, II,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 24, 2019)

Before WILLIAM PRYOR, NEWSOM, Circuit Judges, and VRATIL,* District Judge.

VRATIL, District Judge:

After a 29-day trial, a jury found Joseph Signore, Paul Schumack, and Laura Grande-Signore guilty of conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1349; conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957; mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  The jury also found Signore guilty of promotional and transactional money laundering and Schumack guilty of concealment and transactional money laundering, all in violation of 18 U.S.C. § 1957.  The jury acquitted Grande-Signore on one count of mail fraud, but found her guilty on all other counts.

_____

*Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

2

On appeal, all defendants argue that the district court erred in admitting testimony of Amanda Davis, the government's expert witness, that improperly commented on their mens rea in violation of Fed. R. Evid. 704(b).  Signore and Grande-Signore also argue that their convictions should be overturned because the district court (1) erred in refusing to sever their trial from Schumack's trial, (2) failed to declare a mistrial based on prosecutorial misconduct, (3) failed to declare a mistrial based on juror misconduct, and (4) committed the above errors in a manner which cumulatively denied their rights to a fair trial.  For reasons stated below, we affirm.

## I.  BACKGROUND

Signore and Grande-Signore, husband and wife, were principals of JCS Enterprises Services, Inc. ("JCS").  In the fall of 2011, Signore met Schumack, a principal of TBTI, which was an ATM supplier with a closely-associated marketing business.  The indictment alleges that through JCS and TBTI, defendants operated a $70,000,000 "Ponzi" scheme, i.e. the companies used the principal investments of newer investors to pay older investors what appeared to be high investment returns but were really returns of their own principal or that of other investors.[1]

---

[1]    Craig Hipp, who was also charged in the indictment, was President of Manufacturing and Operations for JCS.  On the government's motion, the district court severed

(continued …)

3

From 2011 through 2014, JCS manufactured and sold virtual concierge machines ("VCMs"), *i.e.* stand-alone computer kiosks with monitor displays that allow users to view advertisements, purchase products and print retail coupons. In November of 2011, JCS and TBTI entered into a contract in which JCS agreed to manufacture and obtain advertising for VCMs and TBTI agreed to sell the VCMs to investors. Signore and Grande-Signore also sold VCMs directly through JCS.

As part of their scheme, defendants convinced investors to purchase mostly nonexistent VCMs for $3,000 or $3,500 apiece. Defendants promised to place the VCMs in prime locations nationwide so that they could generate advertising revenue and transaction fees for investors. Defendants promised that each VCM would earn $300 per month for 48 months.

Over time, defendants sold between 22,000 and 26,000 VCMs. In reality, only 84 of them became operational in the field (with some 100 additional units in the "demo stage"). Defendants paid investor returns from money from new investors, however, not from VCM advertising revenue.

JCS allowed investors to purchase VCMs on their credit cards. JCS worked with Merchant One, a credit card processor, and FirstData, a merchant bank. JCS

---

[1](… continued)
Hipp's trial to avoid a *Bruton* issue. *See Bruton v. United States*, 391 U.S. 123 (1968). A jury convicted Hipp of mail fraud, wire fraud, and conspiracy to commit mail fraud and wire fraud. We previously affirmed Hipp's convictions. *See United States v. Hipp*, 644 F. App'x 943 (11th Cir. 2016).

4

arranged for its merchant account to receive monies from sales from both JCS and TBTI.  Many investors disputed their charges or sought refunds of their VCM purchases.  When an investor did so, FirstData issued a chargeback (refund) to the investor with funds from the JCS account.  If the JCS account lacked sufficient funds, FirstData provided the funds itself.  FirstData ultimately lost $7.3 million in chargebacks for consumer refunds or losses on VCM purchases.

According to bank records, JCS and TBTI ultimately received $80.7 million from 1,814 investors for some 22,000 VCMs.  The companies would have needed $243 million to pay off their investors, but their 84 operational VCMs earned only $21,233 in advertising revenue over nearly three years.

TBTI transferred approximately $2.4 million to PSCS, an entity affiliated with Schumack.  Schumack used this money to fund personal purchases including a home and investments.  JCS and TBTI transferred nearly $1 million to JOLA, an entity related to Signore and Grande-Signore, which they used for personal purchases including a home and vehicle.

None of the defendants testified.  Through counsel, defendants maintained a defense based on lack of fraudulent intent.

Signore's defense was that he ran a legitimate business and acted in good faith in reliance on advice from attorneys and accountants that JCS operations were legal.  Counsel maintained that until the business was shuttered in March of 2014,

5

JCS was operating a legitimate business that was spending time and resources to work out the kinks with the VCMs and VCM software.

Schumack's defense was that he acted in good faith and lacked fraudulent intent. Schumack maintained that based on information provided by Signore and JCS, he had a good faith belief that JCS was legitimate and had manufactured the VCMs which he sold. Schumack also maintained that he had a good faith belief that the money which he received from the sale of VCMs represented legitimate brokerage fees that he had earned.

Grande-Signore's defense was also that she acted in good faith and lacked fraudulent intent. She asserted that (1) she lacked the knowledge and willful intent to engage in a Ponzi scheme and (2) Signore had retained attorneys and accountants and she reasonably believed that they had properly advised him about the legality of JCS's business.

## II. DISCUSSION

A.    *Expert Testimony About A Ponzi Scheme (All Defendants)*

The government presented a summary witness, Amanda Davis, an expert in forensic accounting. Defendants argue that in violation of Fed. R. Evid. 704(b), Davis improperly commented on their mens rea. At trial, the district court overruled defendants' request to preclude Davis from using the phrase "Ponzi scheme." The district court also overruled defendants' motion for a mistrial after

6

Davis defined a Ponzi scheme as a "type of investment fraud." We review the district court's evidentiary rulings and denial of a motion for mistrial for an abuse of discretion. *See United States v. Joyner*, 899 F.3d 1199, 1206 (11th Cir. 2018).

Davis testified about the revenue, receipts, and expenditures of JCS and TBTI. Specifically, she testified that the companies sold $80.7 million in VCMs yet earned merely $21,233 in advertising revenue. Government counsel asked Davis whether she had formed an opinion about what was going on with JCS and TBTI. Signore's counsel objected because the question went to the ultimate issue of intent. The district court overruled the objection, but briefly explained to the jury the nature of the fraud charges, including the government's burden to show that each defendant made a material misrepresentation "with the intent to deceive, with the intent to cheat somebody out of money." The district court also cautioned that while an expert witness can describe what was taking place in certain financial transactions, an expert is not allowed to "give an opinion about the mindset of a particular defendant[, which is] . . . for the jury to decide based on all of the evidence that is presented."

Davis then testified that after reviewing the various records, she believed that "JCS and TBTI operated a Ponzi scheme." Signore's counsel again objected, because Davis was testifying on the "ultimate issue." The district court overruled the objection and explained to the jury that opining about what constitutes a Ponzi

7

scheme is different than discussing "the mental intent of the people responsible for moving the money."

Government counsel then asked Davis to define a Ponzi scheme. Davis stated as follows:

> A Ponzi scheme is a type of investment fraud. When a Ponzi scheme occurs, new investor money that flows into the Ponzi scheme is not used for its intended purpose. Instead, it's used to pay the returns that were promised to earlier investors, and that usually happens[.] That usually happens because the underlying business that's supposed to generate the returns for the investors is insufficient or does not exist. And, so this scheme itself is dependent upon new investor money to stay alive.

Defendants did not object, but the district court again cautioned the jury that whether any defendant had fraudulent intent was a jury issue and that Davis could not testify whether certain conduct constituted a fraud or that "whoever is in charge of moving money and making financial decisions" had the intent to deceive.

On recess, defendants moved for a mistrial because Davis had used the term "fraud" in her definition of a Ponzi scheme. The district judge denied the motion for mistrial. When trial resumed, however, the district court again instructed the jury about the "very significant difference between the concept of fraud and simply using the term . . . Ponzi to describe the movement of money from a later investor to pay off an earlier investor." The district judge noted that while Davis could "graph out where the money came from and what happened to it," she could not and was not attempting to opine on any individual's intent. The district judge

8

emphasized that based on all the evidence, the jury had to determine whether a particular defendant acted with the intent to deceive.

Defendants argue that the district court erred in allowing Davis to opine that defendants' companies were running a "Ponzi scheme." Rule 704(b), Fed. R. Evid., provides that in a criminal case, an "expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Those matters are for the trier of fact alone. *Id.* Rule 704(b) bars expert testimony that expressly states an opinion as to defendant's state of mind at the time of the offense. *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988). Even so, Rule 704(b) does not bar expert testimony which stops short of stating an opinion on defendant's state of mind and "le[aves] this inference for the jury to draw." *United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011) (per curiam) (quoting *Alvarez*, 837 F.2d at 1031).

Davis testified that based on the financial records, she believed that JCS and TBTI operated a Ponzi scheme. Rule 704(b) did not preclude this testimony, which described Davis' conclusion that new investor money was being used to pay returns promised to earlier investors. In describing the flow of money as a Ponzi scheme, Davis did not opine that any particular defendant engaged in this scheme

9

or acted with the intent to deceive.  Accordingly, the district court did not abuse its discretion in refusing to exclude her testimony in this regard.

Davis testified further that a Ponzi scheme is a "type of investment fraud." Defendants moved for a mistrial based on Davis's use of the word "fraud."  We find it unnecessary to determine whether the testimony was improper under Rule 704(b).[2]  Even if the testimony was improper, the district court did not err in overruling defendants' motion for mistrial.  While the district court did not formally strike the testimony that defined a Ponzi scheme as a type of investment fraud, it took abundant curative measures to prevent the jury from drawing conclusions about defendants' intent based on that testimony.  Specifically, it cautioned the jury that Davis was not offering an opinion as to whether certain conduct constituted fraud or whether any particular defendant had intent to deceive.  And it told the jurors no fewer than three times that defendants' intent was an issue they alone must decide.  These curative instructions decreased the possibility of undue prejudice and supported the district court's decision not to grant a mistrial.  *United States v. Perez*, 30 F.3d 1407, 1411 (11th Cir. 1994).

---

[2]    Rule 704(b) does not appear to bar the testimony because Davis did not "expressly state a conclusion that the defendant[s] did or did not have the requisite intent." *Alvarez*, 837 F.2d at 1031; *see also United States v. Locke*, 643 F.3d 235, 242 (7th Cir. 2011) ("The witnesses' responses neither approached the statutory language nor commented on [defendant's] specific intent in any way.  Rather, each witness . . . us[ed] 'fraud' or 'misrepresentation' in a colloquial sense, employing the vernacular of their financial professions.").

"[T]he district court's refusal to declare a mistrial will not be overturned unless the evidence is so highly prejudicial as to be incurable." *United States v. Dodd*, 111 F.3d 867, 870 (11th Cir. 1997).

Here, Davis did not directly state that any specific defendant engaged in fraud or acted with intent to deceive. In the context of a 29-day trial, the brief reference to "investment fraud," even if improper, was not so prejudicial as to be incurable by the court's instruction. Accordingly, the district court did not abuse its discretion in overruling defendants' motion for mistrial related to Davis's definition of a Ponzi scheme.[3]

B.    *Motion To Sever (Signore and Grande-Signore)*

Signore and Grande-Signore argue that the district court erred in denying their motions to sever and subsequent motions for mistrial. We review for abuse of discretion. *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007).

Because the indictment alleges that Signore, Grande-Signore, and Schumack conspired to commit mail fraud, wire fraud, and money laundering, joinder was proper. *See id.* Rule 14(a), Fed. R. Crim. P., provides that "[i]f the joinder of

---

[3]    Defendants did not object to government counsel's question to Davis about the definition of a Ponzi scheme. To the extent that defendants' appellate briefs could be read as a challenge to the district court's initial decision to admit such testimony, our review is for plain error. *United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007). For substantially the reasons stated above, defendants have not shown plain error from the admission of Davis's definition of a Ponzi scheme. *See United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005) (defendant must show error that is plain and affected his or her substantial rights, *i.e.* error "affected the outcome of the district court proceedings").

11

offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  A new trial due to a refusal to grant severance before trial, or to grant a mistrial once trial has commenced, is not warranted unless defendant demonstrates that (1) the joint trial prejudiced him or her; and (2) severance was the proper remedy for that prejudice.  *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993); *United States v. Blankenship*, 382 F.3d 1110, 1122 (11th Cir. 2004).  We are reluctant to reverse a district court's refusal to sever, particularly in conspiracy cases.  *Browne*, 505 F.3d at 1268.

The fact that defendants present antagonistic or mutually exclusive defenses is not per se prejudicial.  *Zafiro*, 506 U.S. at 538; *United States v. Hill*, 643 F.3d 807, 834 (11th Cir. 2011).  Co-defendants do not suffer prejudice "simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses."  *Blankenship*, 382 F.3d at 1125 (one defendant asserted that he was innocent victim of other defendants' manipulative schemes).[4]

---

[4]      In some post-*Zafiro* cases, we have not precisely articulated whether "mutually exclusive" defenses are sufficient by themselves to warrant severance.  *See, e.g., United States v. Garcia*, 405 F.3d 1260, 1272 (11th Cir. 2005) ("[T]o compel severance, the defenses of co-defendants must be more than merely antagonistic, they 'must be antagonistic to the point of being mutually exclusive.'"); *United States v. Knowles*, 66 F.3d 1146, 1159 (11th Cir. 1995)

(continued …)

Even if defendants can establish some prejudice, the district court has discretion to formulate an appropriate remedy. *Zafiro*, 506 U.S. at 538. "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540; *see also United States v. Morales*, 868 F.2d 1562, 1572 (11th Cir. 1989) (joint trial necessarily prejudicial to some degree). The Supreme Court has noted that severance is the only permissible remedy in limited circumstances, *i.e.* circumstances in which there is a serious risk that a joint trial would either "compromise a specific trial right of one of the defendants" or "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Signore cites multiple incidents of prejudice which the Court addresses in turn.

1.    *Testimony Of Signore's Use Of Another's Social Security Number*

Signore argues that in violation of Rule 404(b), Fed. R. Evid., the joint trial allowed Schumack to introduce evidence that Signore used someone else's social

---

[4](… continued)
(same). *Zafiro* plainly requires, however, that to warrant severance, a defendant establish more than mutually exclusive or irreconcilable defenses. *Zafiro*, 506 U.S. at 537–38 (declining to adopt bright-line rule which mandates severance whenever codefendants have "mutually antagonistic" or "irreconcilable" defenses). Indeed, we acknowledged in *Blankenship* that *Zafiro* "implicitly overrule[d]" our pre-*Zafiro* precedent to the extent that it required severance in the case of mutually exclusive defenses. *Blankenship*, 382 F.3d at 1122 n.23; *see also id.* at 1125 n.27 (explaining that our binding post-*Zafiro* precedent rejects per se rules).

13

security number ("SSN").  At trial, Robert Ray, a dairy farmer from West Virginia, testified that he did not know Signore and he never authorized anyone to use his social security number.  Still, his SSN along with Signore's name, date of birth, and signature were on the amended application that JCS submitted to FirstData for a merchant account.  At trial, Signore objected to the testimony under Rules 404(b) and 403, Fed. R. Evid.  The district court overruled Signore's objection, finding that (1) Rule 404(b) did not apply because Signore's use of Ray's SSN was "inextricably intertwined" with the charged conspiracy and (2) the evidence was not more prejudicial than probative under Rule 403.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  "The admissibility of evidence of uncharged conduct depends on whether the evidence is extrinsic or intrinsic to the charged offense."  *United States v. Shabazz*, 887 F.3d 1204, 1216 (11th Cir. 2018).  "If the evidence is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offenses, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offenses, then it is admissible as intrinsic evidence as long as it satisfies the requirements of Rule 403."  *Id.* (internal quotation marks and citation omitted).

14

Intrinsic evidence of a conspiracy is still subject to Rule 403. *United States v. Dixon*, 901 F.3d 1322, 1345 (11th Cir. 2018), *cert. denied sub nom. Portela v. United States*, 139 S. Ct. 854 (2019), and *cert. denied sub nom. Chacon v. United States*, 139 S. Ct. 1392 (2019). Under Rule 403, a district court has the discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

We find it unnecessary to decide whether Ray's testimony was properly admitted because, even if it was not, the overwhelming evidence against Signore made any error harmless. *See United States v. Lane*, 474 U.S. 438, 450 (1986) (holding harmless the introduction of evidence resulting from the misjoinder of one count of an indictment); *United States v. Jiminez*, 224 F.3d 1243, 1250 (11th Cir. 2000) (declining to determine whether evidence was intrinsic because any possible error was harmless). The government presented overwhelming evidence that JCS sold many more VCMs than it operated or even built, that it operated as a Ponzi scheme by paying past investors with new investors' principal, and that all of the defendants knew the enterprise was a sham. The evidence included, among much else, Signore's lifelong friend's testimony that Signore asked him to lie to the FBI that JCS had shipped machines Signore knew it had never shipped. The evidence

15

abundantly showed that Signore, in his own words, "worked extremely hard on [JCS's] business model" and "really watch[ed] over everything."  The government made no reference to Ray's testimony in its closing argument, not even when it regaled the jury with a long list of Signore's dishonest actions supported by the evidence.  *See United States v. Barton*, 909 F.3d 1323, 1338 (11th Cir. 2018) ("whether counsel focused on the evidence during the trial" relevant to harmless-error analysis) (internal citation omitted).  And although Schumack referred to Ray's testimony in his closing argument, the jury obviously rejected Schumack's attempt to shift all of the blame to Signore; it convicted Schumack on all counts.  In short, even if we assume that Ray's testimony was inadmissible, we conclude that it "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."  *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992).  Signore has not shown that he suffered "compelling prejudice" from the joinder of Schumack on this basis.

## 2.    *Signore Email Of Order From Tenet Hospitals*

Signore argues that the joint trial allowed Schumack to introduce hearsay evidence of an email exchange between Signore and Schumack on September 12, 2012, in which Signore indicated that Tenet Hospitals had ordered 4,000 "units," and Schumack responded that he had "to get a ton more investors quick."  On the government's objection, the district court initially excluded the evidence as

16

hearsay.  At sidebar, Schumack argued that he did not seek to introduce the email

for its truth, but to show that in his communications with potential investors about

orders for VCMs and their various locations, he had relied in good faith on

Signore's representation that Tenet Hospitals had ordered 4,000 VCMs.  The

district court then explained to the jury that it was admitting the email "not for the

truth of what's in there, but simply so you folks can make a judgment of was this

representation made."

The evidence was not hearsay because it was introduced to show that

Signore made the statement in his email to Schumack, not that Tenet Hospitals

actually ordered 4,000 VCMs.  *See United States v. Rivera*, 780 F.3d 1084, 1092

(11th Cir. 2015) (statements offered only to show effect on listener not hearsay).

The district court did not abuse its discretion in admitting Signore's email about

the order from Tenet Hospitals.

3.      *Grande-Signore Statement That JCS Might Be A Ponzi Scheme*

Kevin O'Connell, a gym owner, testified that after Grande-Signore briefly

explained how JCS operated, he told her that it sounded like a Ponzi scheme.

O'Connell testified that after he explained what a Ponzi scheme was, Grande-

Signore said something to the effect of, "Yeah, I think that's what this is.  I think

that's what's going on."  Signore argues that given this testimony, a joint trial

denied his rights under *Bruton v. United States*, 391 U.S. 123 (1968).  Signore did

17

not assert a *Bruton* error below, so we review for plain error. *Joyner*, 899 F.3d at 1206.

In *Bruton*, the Supreme Court held that the Confrontation Clause prohibits admission of a nontestifying defendant's confession in a joint trial if the confession directly inculpates another defendant. 391 U.S. at 126; *see United States v. Hano*, 922 F.3d 1272, 1286 (11th Cir. 2019). Consistent with every one of our sister circuits, we recently held that *Bruton* applies only to testimonial statements. *See Hano*, 922 F.3d at 1287. If the challenged statement is not testimonial, the Confrontation Clause does not apply. *Id.*

Here, Grande-Signore's statement to O'Connell was non-testimonial and *Bruton* does not apply. Grande-Signore made the statement during a casual conversation with a gym owner and she had no reason to believe that the statement would be used as a substitute for trial testimony. *See Ohio v. Clark*, ⸺ U.S. ⸺, 135 S. Ct. 2173, 2180 (2015) (out-of-court statement "testimonial" if purpose to "creat[e] an out-of-court substitute for trial testimony") (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). In addition, *Bruton* does not apply because Grande-Signore's statement did not "directly inculpate" Signore. *Joyner*, 899 F.3d at 1206–07 (quoting *United States v. Beale*, 921 F.2d 1412, 1425 (11th Cir. 1991)). Grande-Signore merely told O'Connell her general understanding of how money flowed at JCS. In closing, the government referred to Grande-Signore's statement

18

as *her* admission that she knew JCS was operating a Ponzi scheme, not as an indication of Signore's guilt. On its face, the statement was not incriminating to Signore; it only became so when linked with additional evidence. *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (*Bruton* does not apply to confession "not incriminating on its face [that] became so only when linked with evidence introduced later at trial"); *Joyner*, 899 F.3d at 1206–07 (*Bruton* only excludes non-testifying defendant's statements which directly inculpate co-defendant).

Signore has not shown that the joint trial denied him his rights under *Bruton*.

4.    *Counsel's Questioning Of Witnesses*

Signore argues that Schumack's counsel asked improper questions which invited two witnesses, Melissa Kuper and Andrew Saka, to agree that Signore's actions and words were fraudulent. As to Kuper, Signore objected to a question about attempts to convince the "head of JCS, who you now kn[o]w was committing a fraud to return your friend's money." The district court sustained the objection and directed Kuper to "take the word fraud out of there, but you were trying to get the money back, is that correct?" Kuper answered affirmatively. As to Saka, the district court sustained Signore's objection to a question which asked if he was conspiring with Signore to "perpetrate a fraud" and one which asked Saka if he knowingly passed on "false information" from Signore. Signore argues that even though the district court sustained his objections, the questions

19

themselves were prejudicial. In light of the court's instructions which reminded the jury to consider only evidence that has been admitted, however, we find no prejudice.

5.    *Cumulative Impact Of Schumack's Defense On Co-Defendants*

Signore claims that he suffered prejudice because of the above incidents, combined with the actions of Schumack's counsel as a "second prosecutor." Signore insists that Schumack's "entire defense, including closing arguments, were both improper and prejudicial." In *Zafiro*, the Supreme Court did not identify the "second-prosecutor, finger-pointing" situation as one which necessarily warrants severance. *Hardy v. Comm'r, Ala. Dep't of Corr.*, 684 F.3d 1066, 1079 (11th Cir. 2012) (citing *Zafiro*, 506 U.S. at 539). Signore argues that we should revisit *Hardy*, which he maintains "rejected" the second prosecutor theory as a sufficient basis for severance. *Hardy*, however, simply noted that the Supreme Court had not recognized this theory as a ground which required severance. Regardless of how we label co-defendant's strategy, we evaluate whether defendant has shown prejudice and if so, whether severance was the only proper remedy for any prejudice. *Zafiro*, 506 U.S. at 538.

Signore and Grande-Signore have not demonstrated such prejudice from the joint trial that severance was the only proper remedy. The fact that defendants presented different defense strategies and potentially antagonistic defenses did not

establish cognizable prejudice.  In addition, the district court substantially reduced the risk of prejudice by instructing the jury to consider the evidence separately against each defendant, as to each count.  Although the thrust of Schumack's defense was to blame Signore, the jury instructions cured any arguable prejudice on account of that finger-pointing.  *Blankenship*, 382 F.3d at 1126.  A court's cautionary instructions ordinarily will mitigate the potential "spillover effect" of evidence of a co-defendant's guilt.  *United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006).  Moreover, the fact that the jury acquitted Grande-Signore on Count 15 suggests that it conscientiously sifted through the evidence and made individualized determinations as to each defendant.  *See Morales*, 868 F.2d at 1571 (jury's ability to isolate evidence and consider it against separate defendants best illustrated by acquittal of one defendant on single count).  Defendants have failed to show that the joint trial violated their "substantive trial-related rights" or "undermined the reliability of the jury's verdict."  *Blankenship*, 382 F.3d at 1125–26; *see Zafiro*, 506 U.S. at 539.  Accordingly, the district court did not abuse its discretion in denying defendants' motions to sever and failing to declare a mistrial on the issue of severance.

C.      *Prosecutorial Misconduct (Signore and Grande-Signore)*

Signore argues that the district court erred when it failed to declare a mistrial after FBI Agent Waldo Longa commented on his right to remain silent.  Signore

21

and Grande-Signore also argue that the district court erred when it failed to declare a mistrial based on government counsel's comments in closing argument about their rights to remain silent.

Allegations of prosecutorial misconduct present mixed questions of fact and law that are ordinarily subject to de novo review. *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). Defendants objected at trial to government counsel's comments in closing argument. Accordingly, we review de novo defendants' argument that the comments constituted prosecutorial misconduct. Because Signore did not object to Agent Longa's testimony or otherwise call the issue to the attention of the district court, however, we review that issue for plain error. *United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017).

To establish prosecutorial misconduct, defendant must show that (1) the prosecutor's questions or comments were improper and (2) they prejudicially affected his or her substantial rights. *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011); *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). To show prejudice to substantial rights, defendant must establish a reasonable probability that but for the remarks, the outcome of the trial would have been different. *Lopez*, 590 F.3d at 1256.

The Fifth Amendment prohibits the prosecution from commenting directly or indirectly on defendant's failure to testify. *United States v. Muscatell*, 42 F.3d

22

627, 631–32 (11th Cir. 1995) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)).  A statement violates defendant's Fifth Amendment right if it was either "*manifestly intended* to be a comment on the defendant's failure to testify" or "was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  *United States v. Knowles*, 66 F.3d 1146, 1162–63 (11th Cir. 1995) (emphasis in original) (internal quotation marks and citation omitted).  Defendant has the burden to establish that one of these two conditions is satisfied.  *Id.* at 1163.

       1.    *Agent Longa Testimony*

Agent Longa testified about information which JCS provided in response to a grand jury subpoena.  When Signore's counsel asked whether JCS had presented a signed contract between Schumack and Signore, Agent Longa testified that JCS submitted one with a sticker on it saying "forged" so "if he's claiming that that is not his signature, then I'm going to say that JCS did not provide to the grand jury any signed executed contracts."  After some further testimony, the district court excused the jury and instructed the witness to answer only the question posed.  The district court explained to Agent Longa that his reference to what Signore was "claiming" was inappropriate because a defendant has an absolute right to claim nothing.

23

Signore argues that through Agent Longa's testimony, the government improperly commented on his right to remain silent and that after Agent Longa's comments, the district court plainly erred in failing to declare a mistrial. Signore has not shown plain error. The district judge admonished Agent Longa to be more careful to listen to and answer each question directly. Most likely because Signore did not object or seek a mistrial on account of Agent Longa's testimony, the district judge did not address whether his testimony was manifestly intended to comment on Signore's failure to testify or whether a jury would naturally and necessarily understand it to be such a comment. On review, we find that the district judge did not plainly err in declining to declare a mistrial. Signore's own counsel asked whether JCS, as directed by one of the persons in charge of the business, had presented a "signed contract" to the grand jury. This question basically required Agent Longa to testify whether a "signed contract" was still a signed contract if JCS submitted it with a sticker that said "forged." Counsel's question was inartful, to say the least, and invited the confusion which precipitated Agent Longa's testimony. On its face, Agent Longa's testimony – while confused and careless – does not reflect a manifest intent to comment on Signore's failure to testify and the jury would not naturally and necessarily take it as such a comment. *See Knowles*, 66 F.3d at 1162–63. Accordingly, the district court did not plainly err in failing to declare a mistrial in response to Agent Longa's testimony.

24

2.    *Comments In Government Rebuttal Closing*

Signore and Grande-Signore argue that through the prosecutor's closing statement, the government improperly commented on their rights to remain silent and shifted the burden of proof.  In its rebuttal closing, the government noted the absence of evidence that any of the defendants had acted in good faith reliance on an accountant.  The government also stated that for Grande-Signore and Schumack to show good faith reliance, "they have to have actually told you or indicated to you somehow, through the evidence, that they relied upon in good faith something that was told."  Following a defense objection, the government clarified that it "always bears the burden of proving intent," but that defendants had not presented sufficient evidence to support their defense of good faith reliance.  Defendants again moved for a mistrial or a curative instruction, arguing that the government had shifted the burden to prove good faith and had violated their rights to silence by referring to lack of evidence supporting their good faith defenses.  The district court denied the motion for mistrial, concluding that the jury instructions included the proper burden of proof, the prosecutor had "absolutely cleared up" any ambiguity following the defense objection, and the prosecutor's comment about the accountant's failure to testify "was not manifestly intended as a comment on[] Signore's failure to testify."  The district court also noted that counsel for all defendants had likely "opened the door" by telling the jury what their clients were

25

"feeling" and various other things "for which the client [could] be the only source."

While the prosecution may not make comments that shift the burden of proof to defendant or comment on a defendant's failure to testify, it may comment "on the failure by defense counsel, as opposed to the defendant, to counter or explain evidence." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1315 (11th Cir. 2010) (quoting *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998)). Likewise, the prosecutor may comment on the "lack of evidence" supporting defendant's theory of the case. *Id.*; *see United States v. Exarhos*, 135 F.3d 723, 728 (11th Cir. 1998) (defense counsel suggestion that defendants involved in legitimate business invited prosecution rebuttal regarding complete absence of receipts). Indirect references to a defendant's silence are not per se reversible error. *Exarhos*, 135 F.3d at 728.

Here, the government pointed out the lack of evidence supporting the good faith defenses, but also emphasized that it bore the burden of overcoming them. In context, the prosecutor's comments were not of such a character that the jury would naturally and necessarily take them to be a comment on any defendant's failure to testify or shifting the burden of proof. We also agree with the district court that the prosecutor's statements do not appear to be "manifestly intended" to comment on defendants' rights to remain silent.

26

3.    *Impact Of Any Prosecutorial Misconduct*

Even if defendants could establish some level of prosecutorial misconduct based on the above comments, they have not shown that the remarks prejudicially affected their substantial rights.  In light of overwhelming evidence of guilt, the isolated nature of the comments in a 29-day trial and the district court's instructions, defendants have not established a reasonable probability that but for the remarks, the outcome of the trial would have been different.  *Lopez*, 590 F.3d at 1256; *see United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (no prejudice to substantial rights when government only pointed out that defendant had opportunity to present evidence, lawyers and court reminded jury that government had burden of proof, and district court gave instruction on burden of proof); *United States v. Bailey*, 123 F.3d 1381, 1402 (11th Cir. 1997) (any possible prejudice resulting from prosecutor's closing argument cured by instructions that lawyers' arguments are not evidence and jury is to decide case solely on evidence presented at trial).

D.    *District Court Response to Juror Misconduct*

Signore and Grande-Signore argue that the district court should have conducted a more extensive and thorough investigation into several instances of

27

juror misconduct.[5]  We review procedures used to address juror misconduct for abuse of discretion.  *United States v. Sammour*, 816 F.3d 1328, 1336 (11th Cir. 2016).  We review for clear error a finding that a juror was not biased.  *Id.*

Defendants contend that the following incidents constituted juror misconduct:

1.      On the sixth day of trial (the second day of witness testimony), Juror 12 informed the district court that before the jury was empaneled, she had run two Google searches for the case, read an article indicating that Hipp had already been convicted, and discussed the case with co-workers.  On Signore's motion, joined by the government, the district court excused Juror 12.

2.      Later on the sixth day of trial, a juror had a severe coughing fit and indicated that she would like water.  In response, the testifying witness, Melissa Kuper, poured a cup of water from a carafe on the witness stand and handed it to the juror.  Signore's counsel heard the coughing juror say, "How nice," and another juror say, "How sweet."  Defendants moved for a mistrial on the ground that after the incident, the jury could not properly evaluate Kuper's credibility.  The district court denied the motion and instructed the jury that in evaluating

---

[5]      In his reply, Schumack states that he continues to adopt the juror misconduct argument of co-counsel.  Schumack did not raise the issue in his initial brief.  Accordingly, we do not consider the juror misconduct argument as to Schumack.  In any event, for reasons stated as to Signore and Grande-Signore, the district court did not err in how it handled the various incidents of juror misconduct.

28

Kuper's testimony, it was "terribly important that the jury not consider" her conduct in handing a cup of water to the juror. The court asked the jury whether it could follow this instruction, and the jury collectively responded that it could.

3.    On the seventh day of trial, Juror 3 sent the court a note stating as follows:

> On Tuesday and Wednesday in the jury room before court started for the day and during breaks, several jurors were discussing the defendants, specifically Mr. Schumack. One juror [later identified as Juror 16] called him, quote, a dirty old man, close quote. Then said, [w]ell, that's what he looks like to me. I mentioned that I didn't think we were supposed to be discussing anything about the case. And she said she wasn't discussing the case, just commenting. This is crossed out, but it says, [t]hen yesterday, Wednesday, the same juror began to discuss with another juror [later identified as Juror 5] -- and she states this, again, on the next page -- the same juror [Juror 16] commented on the witness, Ms. Kuper, and that she was the -- quote, unquote -- star witness and wondered where the attorney was going with the questioning. Another juror [apparently Juror 5] made a comment, that's speculation, nothing concrete; just wondering out loud. [A]gain said, [w]e probably shouldn't discuss it and walked out of the room. Then she replied, No, we can talk about it in the jury room; just not to anyone outside. Then I walked out.

Defendants asked the district court to declare a mistrial without further questioning Juror 3. The district court declined to do so but inquired of Juror 3, who identified Jurors 5 and 16 as the individuals referenced in her note. Juror 3 told the district court that the comments took place in the jury room, where most if not all members of the jury were present, the comments were loud enough for anyone in the room to hear, and others may have also commented. Juror 3 related

29

that Juror 16 had commented that Grande-Signore sat with no expression on her face. Juror 3 agreed that she could be impartial and put aside the comments by others.

After Juror 3 left the courtroom, Signore needed emergency medical attention and medical personnel took him away.

The district court declined to pose suggested additional questions to Juror 3.[6] Signore moved for a mistrial because he would not be present when the jury returned to the courtroom, and the jury would wonder and potentially think something was "inherently wrong with his absence." The district court denied Signore's motion. When the jury returned, the district court told the jurors that "a medical issue had arisen" so trial would stop at that point and resume on Monday morning.

When trial resumed with all counsel and defendants present, the district court read a note from Juror 16 about scheduling. The district court then inquired of Juror 16, who admitted that she made the comment that Schumack looked like a "dirty old man," that she jokingly referred to Kuper as the "star witness," and that she commented that all that Grande-Signore did in court was stare straight ahead.

---

[6]     The appellate record does not include the specific questions that defense counsel suggested. Defense counsel requested generally that the district court ask Juror 3, or in the alternative each individual juror, questions "to determine who else participated in the conversations with [Juror 16] and [Juror 5]; who overheard the conversations between the two jurors and what influences [were] caused by referring to Ms. Kuper as a star witness."

Without prompting, Juror 16 then stated that she might have a problem with a defendant not testifying. On motion of all defendants and without government objection, the district court excused Juror 16.

The district court then reiterated the presumption of innocence and reminded the jury that before deliberations began, even with each other in the jury room, they could not discuss the case. The district court polled the jurors, each of whom indicated that he or she would follow the court's instruction and disregard any remarks previously made by other jurors. The jury then collectively agreed to give each of the defendants "a full presumption of innocence."

The district court did not question Juror 5 about conversations with Juror 16, or inquire who else had heard the remarks of Juror 16. Defendants again moved for mistrial, arguing that the misconduct cast doubt on the jury's ability to follow the court's instructions. Defendants also asked that the court interview Juror 5 about her conversation with Juror 16. The government opposed the motion, arguing that no evidence supported the notion that Juror 5 made inappropriate comments; that none of her comments reflected premature conclusions about any defendant's guilt; and that no extrinsic influence tainted the jury. The court denied defendants' motion for mistral and in so doing, found that the jury had responded truthfully to the polling and remained able to fulfill its responsibility in the case.

31

Juror 3's letter is troubling because it suggests that at least very early in the trial, "several jurors" did not understand their obligation not to discuss anything about the case. Even so, based on their "superior vantage point," district courts have broad discretion to address allegations of juror misconduct. *Sammour*, 816 F.3d at 1338. We have emphasized the wide breadth of the district court's discretion and noted that this discretion "is at its zenith when the alleged misconduct relates to statements made by the jurors themselves, and not from media publicity or other outside influences." *United States v. Bradley*, 644 F.3d 1213, 1277 (11th Cir. 2011) (internal quotation marks and citation omitted); *see United States v. Dominguez*, 226 F.3d 1235, 1246–47 (11th Cir. 2000) (district court in better position to evaluate credibility, as well as mood at trial and predilections of jury) (citations omitted). "This discretion extends to the initial decision whether to interrogate the juror(s) accused of improper communication." *Bradley*, 644 F.3d at 1277.

The district court acted within its broad discretion in responding to the challenged instances of juror misconduct. The district court excused Jurors 12 and 16 after inappropriate conduct and comments. Defendants argue that the district court should have inquired further into the conversation between Jurors 5 and 16, but we are unpersuaded. In declining to interview Juror 5 individually, the district court explained that it had "listened very carefully to Juror Number 5['s]

32

responses" to the jury poll, and it found "that her responses were truthful responses that [could be] relied on."  Moreover, "additional investigation might have over-emphasized" the issue.  *United States v. Harris*, 908 F.2d 728, 734 (11th Cir. 1990); *see Bradley*, 644 F.3d at 1279 ("[W]hile the virtue of hindsight gives us pause, . . . we cannot say that the court abused its discretion in declining to question the involved jurors or to allow defense counsel to do so.").  The district court's decision not to investigate further was not an abuse of discretion.

E.    *Cumulative Error (Signore and Grande-Signore)*

Signore and Grande-Signore argue that the cumulative effect of trial errors deprived them of a fair trial  Because we find no or only minor errors, defendants cannot show cumulative error which warrants reversal.

Defendants' convictions are **AFFIRMED**.

33